**Larry L. McKINNON,**
**Plaintiff-Appellant,**

v.

**CITY OF BERWYN, a municipal corporation, et al., Defendants-Appellees.**

No. 83–2799.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 26, 1984.

Decided Dec. 19, 1984.

As Amended on Denial of
Rehearing Jan. 10, 1985.

John A. Meyer, Chicago, Ill., for plaintiff-appellant.

Edmund J. Scanlan, Scanlan & Hartigan, Chicago, Ill., for defendants-appellees.

Before CUMMINGS, Chief Judge, and POSNER and FLAUM, Circuit Judges.

POSNER, Circuit Judge.

McKinnon, the plaintiff in this civil rights action under 42 U.S.C. § 1983, got a judgment for punitive damages against four policemen in Berwyn, Illinois, and an award of attorney's fees, but he is dissatisfied with the outcome in several respects, and appeals. He challenges the grant of judgment to two of the defendants notwithstanding the verdict—the City of Berwyn (the only defendant against which the jury awarded McKinnon compensatory damages) and the city's chief of police, Caithamer. He challenges the remittitur ordered by the judge of a portion of the punitive damages that the jury had awarded against another defendant, Montoro. And he challenges the judge's action in cutting down his attorney's fee request from $32,280 to $14,500.

The jury could have found the following facts in McKinnon's favor. Officer Montoro was in the process of breaking up with a woman who was living with him. A friend of the woman asked McKinnon (a security

guard) to go to Montoro's home to help the woman remove her belongings. He agreed, and the removal was carried out without incident, but the next day Montoro and three other officers (the four being the defendants against whom the judge allowed McKinnon to recover damages) came from Berwyn to Cicero (Montoro nominally in the capacity of a complaining witness) and arrested McKinnon. Although Chief Caithamer knew or should have known that the officers were going to arrest McKinnon on Montoro's complaint outside of the jurisdiction of the Berwyn police, he did not ask why Montoro had not arrested McKinnon already or what McKinnon had been doing in Montoro's home, and did not order his officers to get an arrest warrant.

One of the officers explained to McKinnon in the course of the arrest: "You mess with one, you're going to mess with all of us." They then shoved McKinnon into the paddy wagon roughly, knocking his head against the door frame; and McKinnon heard Montoro say, "Let's give him a ride now." The driver drove so that McKinnon (who was handcuffed) was banged around against the walls of the wagon, and he was unconscious when they reached the Berwyn police station between 7:30 and 8:00 p.m. When he came to, he asked to see Chief Caithamer, to whom he denied having done anything wrong and offered to take a lie-detector test. Montoro's (false) explanation to Caithamer for the arrest was that McKinnon had pulled a gun on Montoro the day before in Montoro's home and threatened to blow Montoro's head off.

Although blood was running down McKinnon's face, and he complained of dizziness and asked for medical assistance, no one offered him medical aid—but the police were careful to wipe the blood away before taking his "mug shot." After being released on bond around midnight, McKinnon went home. The next day he checked into a hospital, where he spent five days recovering from his injuries.

McKinnon was charged with disorderly conduct, aggravated battery, and other offenses; all charges were dropped on mo-

tion of the state's attorney. After being told by two investigators that McKinnon probably was telling the truth, Caithamer merely told them to offer McKinnon a lie-detector test. Caithamer took no disciplinary action against Montoro or the other officers involved in the arrest.

The defendants put in evidence that cast the incident in a less horrific light—evidence, for example, that McKinnon (a security guard, as we said) was carrying a gun for which he did not have a proper permit when he was arrested, though he had not taken the gun into the Montoro home, and was arrested before the officers noticed that the permit was not proper; that the "gash" in his head was really just a cut, didn't bleed much, and maybe had been inflicted completely accidentally; that McKinnon and his captors were friendly at the police station—actually performing "tricks" (for example, demonstrating wrestling holds) for one another's entertainment. Even if all this was believed, it would not change the basic fact that Montoro and the three officers that accompanied him seized McKinnon without a lawful purpose (they had no idea he didn't have a proper permit for his gun), thereby depriving him of his Fourth Amendment rights (made applicable to state action by the Fourteenth Amendment) and entitling him to seek damages under 42 U.S.C. § 1983. And the jury was not required to believe any of the defendants' evidence except that McKinnon had a gun when he was arrested for which he did not have a proper permit (this much was undisputed).

The jury was asked to assess compensatory as well as punitive damages against each defendant separately. It awarded compensatory damages of $100,000 against the City of Berwyn, but against the other defendants it awarded only punitive damages—$30,000 against Montoro, $10,000 against Caithamer, and a total of $10,000 against the other three officers. By granting judgment notwithstanding the verdict for the city and for Caithamer, the district judge threw out the $100,000 verdict against the city and the $10,000 verdict

against Caithamer. He also ordered McKinnon to remit $20,000 of the $30,000 in punitive damages assessed against Montoro. The effect of all this was to reduce McKinnon's total judgment from $150,000 to $20,000.

The assessment of punitive damages against individual defendants creates no problem; punitive damages, like criminal fines, which they resemble, are always assessed individually. But the obligation to pay compensatory damages to rectify an inseparable injury for which several defendants are liable is joint and several. See Prosser and Keeton on the Law of Torts § 52, at pp. 345–48 (5th ed. 1984). This means that each defendant is liable to the plaintiff for the whole of the plaintiff's damages, except that the plaintiff may not collect, from all the defendants together, more than those damages. The rule of joint and several liability holds even when there is a right of contribution, meaning that a defendant forced to pay a disproportionate amount of the plaintiff's damages may be able to insist that other defendants (or even nondefendant tortfeasors) reimburse him for some of the cost. Indeed, the whole point of contribution is to mitigate the effect of joint and several liability, which allows liability to fall disproportionately on one or some of a group of joint tortfeasors. We therefore need not worry about any right of contribution here; the jury should in any event not have been asked to assess compensatory damages against individual defendants, provided the defendants if liable at all were liable jointly for all McKinnon's injuries. See, e.g., *Slotkin v. Citizens Casualty Co. of New York,* 614 F.2d 301, 317–18 (2d Cir.1979); Annot., 46 A.L.R.3d 801, 808–13 (1972). They would be either if they had conspired against him or if it just was not possible to say what portion of his injuries would have been avoided if a particular defendant had not participated in the wrongful conduct. See Prosser and Keeton on the Law of Torts, *supra*, § 52, at pp. 346–52.

Both grounds for joint liability—conspiracy and indivisible injury—may well have been present, especially the latter; for example, the injury allegedly done to McKinnon by the city and by Caithamer was indivisible from the injury done to him by the officers who actually arrested him and roughed him up. Nevertheless, as the parties jointly requested the verdict form asking the jury to assess compensatory damages individually, McKinnon, even though he also and inconsistently requested that the jury be instructed not to apportion compensatory damages among the defendants, will not be heard to complain about it now. In any event, his appeal does not challenge the judge's refusal to give the requested instruction. We mention the point only to give guidance for the future—which may include further proceedings in this case.

The judge threw out the verdict against the City of Berwyn because McKinnon had not shown that the city itself, as distinct from the individual officers, had violated McKinnon's constitutional rights. This determination was in accordance with the record; McKinnon had made no serious effort to prove either that the officers were acting pursuant to a city policy or that the chief of police was a policy-making official. See *Monell v. New York City Department of Social Services,* 436 U.S. 658, 691–94, 98 S.Ct. 2018, 2036–37, 56 L.Ed.2d 611 (1978); *Reed v. Village of Shorewood,* 704 F.2d 943, 953 (7th Cir.1983). But we agree with McKinnon that there was an insuperable procedural obstacle to the judge's action. Rule 50(b) of the Federal Rules of Civil Procedure authorizes a trial judge to grant judgment notwithstanding a jury verdict only if the moving party had moved for a directed verdict. The lawyer representing all six defendants (the five officers, plus the city) had made five motions for directed verdict at the close of McKinnon's case, each for a different individual defendant— but none on the city's behalf. (The lawyer also failed to renew the motions for directed verdict at the close of all the evidence; but this, as we shall see when we came to Caithamer's motion for judgment notwithstanding the verdict, is a much less serious

procedural default than not moving for a directed verdict in the first place.)

The defendants' lawyer did say in the course of moving for a directed verdict for Caithamer, "At no time is there any indication that John Caithamer engaged in a course of conduct, or the City of Berwyn engaged in a course of conduct directed to deprive individuals of their constitutional rights." He would have us treat this passing reference to the City of Berwyn as the equivalent of a motion for directed verdict in the city's behalf, pointing out that he did file a motion for directed verdict, as Rule 50(b) specifies—filed, in fact, five such motions—and explaining that he failed to file a separate motion on the city's behalf only because, when he glanced over at counsel table while making the motions, he saw only the human defendants—the city, an abstraction, had no representative there.

If we thought there had been no prejudice to McKinnon from the failure of the defendants' counsel to file a separate motion on behalf of the city, then bearing in mind that motions for directed verdict were filed on behalf of all of the city's codefendants, that one lawyer represented all the defendants, and that the left-out defendant was at least mentioned in one of the motions, we might be able to stretch Rule 50(b) to allow the judge to grant judgment notwithstanding the verdict to the city, since:

(1) The rule is not in terms addressed to a multi-party case such as this;

(2) In *Mosley v. Cia. Mar. Adra S.A.*, 362 F.2d 118, 121–22 (2d Cir.1966), it was unclear whether the motion for directed verdict encompassed the third-party plaintiff's claim, yet the court later granted judgment notwithstanding the verdict against that plaintiff;

(3) Something less than a formal motion for directed verdict may preserve a party's right to move for judgment notwithstanding the verdict, see *Pittsburgh-Des Moines Steel Co. v. Brookhaven Manor Water Co.*, 532 F.2d 572, 576–77 (7th Cir.1976); *Bachtel v. Mammoth Bulk Car-*

*riers, Ltd.*, 605 F.2d 438, 441–42 (9th Cir. 1979), vacated on other grounds, 451 U.S. 978, 101 S.Ct. 2301, 68 L.Ed.2d 835 (1981), overruled on other grounds in *Brown v. American Mail Line, Ltd.*, 625 F.2d 221, 223 (9th Cir.1980); cf. *Miller v. Premier Corp.*, 608 F.2d 973, 979 n. 3 (4th Cir.1979);

(4) Cases discussed below allow motions for judgment notwithstanding the verdict to be made even though the movant had failed to renew his motion for directed verdict at the close of all the evidence, as required by Rule 50(b).

But there was prejudice here, so that the judge violated the spirit as well as the letter of Rule 50(b)—assuming it *has* a spirit. The original purpose of making a motion for a directed verdict a prerequisite to asking for judgment notwithstanding the verdict was to still a constitutional concern: that since judgment notwithstanding the verdict was unknown when the Seventh Amendment was drafted in 1789, to render such judgment other than by way of reserved action on a motion for directed verdict (a type of motion that was known at the time) might violate the Seventh Amendment. See 9 Wright & Miller, Federal Practice and Procedure § 2522 (1971). But presumably there was a reason why at common law you could not just spring a motion for judgment notwithstanding the verdict, rather than having to move for a directed verdict before the jury retired to consider its verdict; and whether or not there was a reason then, there is a pretty good reason today. It gives the opposing party a chance to repair—more precisely, to ask the judge for leave to repair—the deficiencies in his proof before it is too late. See, e.g., *Bohrer v. Hanes Corp.*, 715 F.2d 213, 216 (5th Cir.1983); 5A Moore's Federal Practice ¶ 50.08, at p. 50–88 (1984). This is also why Rule 50(a) requires that a motion for directed verdict state its grounds: to alert the opponent to deficiencies that he may still have time to repair—by asking to reopen his case in chief, or by reshaping his cross-examination of the defendant's witnesses, or by putting in evidence in rebuttal to the defendant's case. See, e.g., *Acos-*

*ta v. Honda Motor Co.*, 717 F.2d 828, 831–32 (3d Cir.1983).

■ The reason behind the requirement in Rule 50(b) of having moved for a directed verdict is more than theoretical in this case. If the defendants' counsel had moved for a directed verdict on behalf of the City of Berwyn, explaining that no evidence had been presented that the city's policy-making organs had been involved in the illegalities of the defendant officers, McKinnon's counsel might have taken steps to repair this omission, for example by renewing his offer, which the judge had rejected, to introduce evidence of a previous lawsuit against one of the defendant officers, evidence that might help show that there had been a pattern, perhaps amounting to a policy or custom, of similar violations of Fourth Amendment rights by the Berwyn police force. The judge had excluded such evidence on the ground that it was unduly prejudicial; but if McKinnon's counsel had known that such evidence was vital to his case against Berwyn, his only "deep pocket" defendant—that without it a jury verdict against the city would be thrown out by the judge—he might have been able to convince the judge to let it in. The city's passing reference, in an oral motion for directed verdict that takes up six pages of transcript, was not enough to alert McKinnon's counsel to this need.

■ In his opinion granting the City of Berwyn's motion for judgment notwithstanding the verdict, the district judge said: "We agree with defendant City that the $100,000 verdict is excessive and not supported by plaintiff's evidence on damages. However, since we are granting the City's motion for judgment n.o.v., we need not address this issue." This reservation of the city's alternative motion for a new trial based on the award of allegedly excessive damages was contrary to Rule 50(c)(1) of the Federal Rules of Civil Procedure, which requires a judge, when granting a motion for judgment notwithstanding the verdict, also to rule (conditionally) on the motion for a new trial, so that if (as here) the

grant of the motion for judgment notwithstanding the verdict is erroneous, any error with regard to the motion for new trial can be corrected by the court of appeals at the same time, and obviate the need for successive appeals. It is true that the district judge's opinion also states, "The motion for a new trial is denied," but in context this seems to be a reference to the motions for new trial that had been made by the defendants whose motions for judgment notwithstanding the verdict were denied—otherwise there would be a hopeless conflict with the passage we quoted earlier. In the rather unusual circumstances presented, we think the City of Berwyn should have a chance on remand to renew its motion for a new trial, based on the allegedly excessive damage award.

If the motion is renewed and a new trial ordered, it will be limited to damages unless the ground of the order setting aside the verdict is such as to imply that the whole verdict was tainted—for example, because the jury was carried away by passion or prejudice. See, e.g., *Edwards v. Sears, Roebuck & Co.*, 512 F.2d 276, 282–83 (5th Cir.1975). That is for the district judge to decide. All we hold is that the city is not entitled to judgment notwithstanding the verdict.

■ Since a motion for directed verdict was made on behalf of Caithamer and since we reject McKinnon's contention that the grounds of the motion were not stated with enough detail, the only objection to our reaching the merits of Caithamer's motion for judgment notwithstanding the verdict is that his motion for directed verdict, made at the close of the plaintiff's evidence, was not renewed at the close of all the evidence. Although Rule 50(b) is not so clear on this point as it might be (compare the first two sentences of the rule), the Note of the Advisory Committee on the 1963 Amendment to Rule 50(b) is explicit that renewal is indeed necessary. A number of courts, however, our own included, have not enforced the requirement where no prejudice had resulted to the other party from the failure to renew. See, e.g., *Ohio-Sealy*

*Mattress Mfg. Co. v. Sealy, Inc.,* 585 F.2d 821, 825–26 (7th Cir.1978); *Bonner v. Coughlin,* 657 F.2d 931, 938–39 (7th Cir. 1981) (per curiam); *Pittsburgh-Des Moines Steel Co. v. Brookhaven Manor Water Co., supra,* 532 F.2d at 576–77; *Moran v. Raymond Corp.,* 484 F.2d 1008, 1010–12 (7th Cir.1973); *Ebker v. Tan Jay Int'l, Ltd.,* 739 F.2d 812, 823–24 (2d Cir.1984) (Friendly, J.); *Bayamon Thom McAn, Inc. v. Miranda,* 409 F.2d 968, 971–72 (1st Cir. 1969). If none of the evidence put in as part of the defendant's case weakens the defendant's motion for directed verdict, the plaintiff cannot argue that he thought that the defendant, by not renewing the motion, had abandoned it because its evidentiary foundations had been weakened, and thinking this had therefore not put in rebuttal evidence that might have repaired the evidentiary deficiencies exposed by the initial motion.

However, the defendants' evidence did not so add to the plaintiff's case against Caithamer (Caithamer testified, and some of the testimony helped the plaintiff's case against him, but on balance it could not be said that the plaintiff's case had been appreciably strengthened) that the plaintiff might have been lulled into thinking that Caithamer had not renewed his motion for directed verdict because he had abandoned it. Although in most of the cases we have cited the judge had said he would reserve action on the motion for directed verdict, there was no reservation in *Ohio-Sealy* or *Pittsburgh-Des Moines* and we do not think it should be a rigid precondition for leniency, at least in a case such as this where there is not even a smidgeon of prejudice to the opponent. If there were slight prejudice, a lulling remark by the judge might be necessary to tip the balance in favor of leniency (if more than slight, the motion for judgment notwithstanding the verdict should be dismissed). But bearing in mind that Rule 50(b) is not clearly drafted (one might have thought that after 46 years something would have been done about this), that the requirement of renewing the motion for directed verdict at the close of all the evidence is not intuitive, and

that many parties sued in or removed to federal court are not represented by experienced federal practitioners, it would be excessively strict to confine the policy of leniency to cases where the judge happens to have reserved action on the motion for directed verdict when it was made (and never renewed).

Since Caithamer's motion for judgment notwithstanding the verdict was procedurally proper, we must consider the merits of the judge's action in granting it. The judge said that Caithamer had had no foreknowledge of the officers' designs against McKinnon, had not conspired with them against McKinnon, and had displayed no ill will toward him at the police station. Even if this were a correct reading of the record, it would not necessarily let Caithamer off the hook. It is true that Caithamer could not be held liable for the misconduct of the other officers just because he was their supervisor. Not only is the doctrine of *respondeat superior,* which makes the employer liable without fault on his part for torts committed by his employees in the furtherance of their employment, not applicable in actions under section 1983, *Monell v. New York City Department of Social Services, supra,* 436 U.S. at 691–94, 98 S.Ct. at 2036–37, but the doctrine has no reference (despite its name) to the liability of another employee who happens merely to be the supervisor, but not the employer, of the employee who commits the tort. The common law does not hold a superior strictly liable for the torts of the employees he supervises, so it is no surprise that supervisor strict liability is rejected in section 1983 cases. See, e.g., *Schultz v. Baumgart,* 738 F.2d 231, 238–39 (7th Cir. 1984); *Wolf-Lillie v. Sonquist,* 699 F.2d 864, 869 (7th Cir.1983). Some state statutes do impose liability on police supervisors for the torts of their subordinates, and there is some authority for bringing such statutes into civil rights cases by way of 42 U.S.C. § 1988. See 2 Cook & Sobieski, Civil Rights Actions § 7.10, at p. 7–39 and n. 34 (1984). But no such statute has been cited to us in this case.

All this is not to say that a supervisor is immune from liability; it is just that he must be personally at fault. But bearing in mind that negligent as well as intentional and reckless deprivations of constitutionally protected rights were held to be within the scope of section 1983 in *Parratt v. Taylor*, 451 U.S. 527, 533–37, 101 S.Ct. 1908, 1911–14, 68 L.Ed.2d 420 (1981) (superseding contrary holdings by this court, see, e.g., *Bonner v. Coughlin*, 545 F.2d 565, 567 (7th Cir.1976) (en banc); *Beard v. Mitchell*, 604 F.2d 485, 494 (7th Cir.1979)), it should be enough to make a supervisor liable that he was negligent, whether in selecting or supervising or failing to discharge his subordinates, and that his negligence was causally related to their more direct wrongdoing. It was a question for the jury whether Caithamer, though he bore no ill will toward McKinnon, as did Montoro and (in siding with Montoro) the other officers, was careless (or worse), and if so whether his carelessness contributed to the deprivation of McKinnon's rights. A rational jury could have found that Caithamer participated in a meeting at which Montoro and the three other officers decided to investigate and arrest McKinnon; that Caithamer should have been suspicious of the request of one of his officers for authorization to investigate and arrest a man in a different city, outside the jurisdiction of Caithamer's police force, without a warrant, on the basis of the man's alleged assault, some thirty hours earlier, against the very policeman requesting authorization to make the arrest; that Caithamer's suspicions should have been intensified when the man was brought into the police station with blood running down his face (there is a dispute over how bloody the wound was, but the jury was entitled to believe McKinnon's more dramatic version of the incident); and that it was especially careless for Caithamer to let McKinnon be locked up without medical attention, when Caithamer had personally observed that McKinnon was injured. Caithamer's subsequent conduct in refusing to take any disciplinary action against Montoro, while not in itself causing McKinnon any injury, was evidence from which the jury could have inferred (in combination with the other evidence) that Caithamer was indifferent to the violation of constitutional rights by his officers.

This is not to say that a person who fails to help another avoid being injured by a violation of section 1983 himself violates section 1983. Caithamer is not being sued merely as a bystander, whose inaction would not be actionable, under long-standing principles of tort law applicable to suits under section 1983. See, e.g., *Jackson v. City of Joliet*, 715 F.2d 1200, 1202–03 (7th Cir.1983). His position of responsibility in relation to the police officers created a duty of care, as has been affirmed in cases (more difficult than this) where chiefs of police were alleged to have neglected the training or supervision of the officers under their command. See, e.g., *McClelland v. Facteau*, 610 F.2d 693, 696–97 (10th Cir. 1979). And though this duty would not have been violated if without negligence on Caithamer's part his subordinates had violated McKinnon's rights, there was enough evidence of his negligence to make the issue one for the jury. Indeed, since the jury awarded punitive damages against Caithamer, it no doubt thought him not only negligent but reckless in his disregard for McKinnon's rights, so that it would have been error to grant Caithamer's motion for judgment notwithstanding the verdict even under the standard of liability that prevailed in this circuit before *Parratt v. Taylor*, whereby negligence was not enough for liability under section 1983.

Regarding the judge's order remitting $20,000 of the damages that the jury had assessed against Montoro, McKinnon's complaint is not that the judge abused his discretion in finding the damages excessive but that the judge violated proper procedure in failing to give McKinnon the option of a new trial in lieu of the remittitur. This complaint is well founded. See, e.g., *Kennon v. Gilmer*, 131 U.S. 22, 27–30, 9 S.Ct. 696, 698–99, 33 L.Ed. 110 (1889); *Bucher v. Krause*, 200 F.2d 576, 588 (7th Cir.1953); 11 Wright & Miller,

Federal Practice and Procedure § 2815, at p. 99 (1973). The Seventh Amendment reserves the determination of damages, in jury trials within its scope, to the jury. A federal judge can set aside a jury verdict as excessive, but he can fix the proper level of damages only if the plaintiff is entitled to a particular amount of damages as a matter of law (for example where a statute specifies a fixed sum as liquidated damages for a violation)—which is not the case here. But McKinnon is wrong to argue for reinstatement of the verdict against Montoro. The judge was entitled to set aside the verdict as excessive; his only mistake was to fix the damages. The proper corrective is to give McKinnon the choice he was improperly denied, between accepting the remittitur and having a new trial on damages. See, e.g., *Higgins v. Smith Int'l, Inc.*, 716 F.2d 278, 281 (5th Cir.1983).

The last issue is whether the district judge acted properly in carving down McKinnon's request for attorney's fees (a request based on McKinnon's having prevailed on the merits to the extent of obtaining a $20,000 judgment for punitive damages) by more than 50 percent. The judge refused to multiply the total hourly fees by 1.5 as requested by McKinnon to reflect the fact that if McKinnon had lost the case his lawyer would have gotten no fee at all, and the judge cut down as excessive the number of hours the lawyer put in for. ■ *Blum v. Stenson*, —— U.S. ——, 104 S.Ct. 1541, 1548–50, 79 L.Ed.2d 891 (1984), while reaffirming the principle that a bonus attorney's fee may be allowed in " 'cases of exceptional success,' " quoting *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983), left open the question whether the risk of losing is a permissible factor in judging the plaintiff's success to be exceptional for these purposes. 104 S.Ct. at 1550 n. 17. In this circuit, the risk of losing "alone does not justify the use of a multiplier," *Bonner v. Coughlin, supra*, 657 F.2d at 936; see also *In re Illinois Congressional Districts Reapportionment Cases*, 704 F.2d 380, 382 (7th Cir.1983). And building

on the excellent article by Professor Leubsdorf, *The Contingency Factor in Attorney Fee Awards*, 90 Yale L.J. 473 (1981), the District of Columbia Circuit has questioned the appropriateness of ever using risk as a basis for enhancing the plaintiff's attorney's fee award. See *Laffey v. Northwest Airlines, Inc.*, 746 F.2d 4 at 26–28 (D.C.Cir. 1984); see also *Murray v. Weinberger*, 741 F.2d 1423, 1431 (D.C.Cir.1984); but see *Hall v. Borough of Roselle*, 747 F.2d 838 at 842–43 (3d Cir.1984).

■ The fundamental problem of a risk bonus is that it compensates attorneys, indirectly but effectively, for bringing unsuccessful civil rights suits, even though the attorney's fee statute is expressly limited to cases where the party seeking the fee prevails. See 42 U.S.C. § 1988. Suppose a plaintiff asks for and receives a multiplier of 2 because he had a 50 percent chance of losing the case. This means that if the plaintiff's lawyer tries 10 such cases and wins 5 (as one would expect, if the risk of loss is indeed 50 percent), he will be paid as if he had won them all; that is, he will be paid twice his normal charge for each of the 5 cases he won, to compensate him for getting nothing in the 5 cases he lost. Indeed, if the logic of the risk multiplier were applied consistently, the attorney's fee would be larger the riskier the case, even though this would mean rewarding lawyers for flooding the courts with unmeritorious litigation, something we very much do not need. Imagine a class of cases where only one in 50 plaintiffs prevails. Then the risk multiplier would be 50, and a lawyer who brought all 50 cases and lost 49 would receive the same compensation that he would have received had he been certain to win all 50 cases (in which event there would have been no multiplier), rather than (virtually) certain to lose 98 percent of them.

Moreover, in a case like this one where the plaintiff has a contingent-fee contract with his attorney (here for 40 percent of the plaintiff's recovery if there was an appeal, as there has been), the attorney is already being compensated for the risk of

loss. A contingent fee overcompensates the plaintiff's attorney in cases where the plaintiff recovers substantial damages (because a fee so calculated is not limited to the lawyer's hourly charges for the time he put in on the case), and does so partly in recognition of the risk of loss, since the lawyer will get nothing if he loses. Suppose the contingent fee were 40 percent of the sum of the damages and attorney's fees awarded (as is common), and the jury awarded $100,000 in damages and the judge awarded $20,000 in attorney's fees (without consideration of a possible risk multiplier), thus entitling the plaintiff's attorney to a total fee of $48,000—more than twice the reasonable attorney's fee calculated by the judge. If the reasonable attorney's fee were doubled to reflect the risk of the plaintiff's losing, the total of damages and attorney's fees would be $140,000, thus entitling the attorney (via the contingent-fee contract) to a fee of $56,000. Granted, the actual contingent-fee contract here was different, though not necessarily less favorable ex ante to the lawyer. It entitled him to 40 percent of the damage judgment or the reasonable attorney's fee awarded by the court—whichever was greater. This form of contract partially hedged the lawyer against the downside risk of a low damage award. He is not entitled to more insurance in the form of a risk multiplier.

Finally, a bonus for risk bearing could never be justified in a case as strong as this against most of the defendants. Whether or not the case was weak against the city was not important, even though it was the only deep-pocket defendant. Under Illinois law the city would indemnify the individual defendants for any compensatory damages they were ordered to pay. True, the statute excepts "wilful misconduct," Ill.Rev.Stat.1981, ch. 24, ¶ 1–4–6, but in practice any compensatory damages that policemen are forced to pay in civil rights cases in Illinois are indemnified, at least up to the statutory limits ($100,000 in the case of a city of Berwyn's size—and that is all McKinnon got even against his deep-pocket defendant). It is also true that, judging

from the jury's verdict, the jury may have been reluctant to award substantial damages against the individual defendants, in which case it might be possible to say that McKinnon's overall case in money terms was not so strong. But the jury's verdict may just have reflected the form of the verdict, to which McKinnon's lawyer agreed without having to do so. All things considered, the judge was entitled to conclude that McKinnon could have found a competent lawyer willing to handle this case for the lawyer's normal hourly fee, without insisting on the kind of insurance that the multiplier for which McKinnon is now asking would provide.

As for the judge's determination that the number of hours for which McKinnon requested attorney's fees was excessive, obviously we must defer very broadly to the judge's judgment. He lived with this case throughout its life, observed the lawyers in action, has long experience in civil rights litigation, and all in all has a better feel than we for the reasonableness of the time put in by McKinnon's counsel. Although as an original matter we might be inclined to question his cutting counsel back to eight hours for the preparation of a long and carefully drafted complaint, we certainly agree that the ten hours that counsel put in for preparation of closing argument were excessive and that the more than 20 hours that he put in for drafting what he inaccurately describes as a thorough response to the defendants' motion to dismiss the complaint (the response being in fact a superficial six-page brief that cites only six cases) was grossly excessive—and that in sum the district court's recalculation of the attorney's fees was reasonable and must be upheld. Of course, should McKinnon get a better judgment on remand, he may be entitled to an additional award of attorney's fees.

To summarize, the judgment is reversed insofar as it grants judgment notwithstanding the verdict to defendants Caithamer and City of Berwyn and directs that judgment for only $10,000 be entered against defendant Montoro, and is otherwise af-

**1394**

firmed; and the case is remanded with instructions to the district judge to (1) reinstate the verdict against Caithamer, (2) offer the plaintiff the choice of a new trial on damages against Montoro, (3) rule on whether the verdict against the City of Berwyn shall be reinstated or set aside. Costs in this court are awarded to the appellant. Rule 18 shall not apply on remand.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.