**Eugene MOLNAR, Plaintiff,**

v.

**ELGIN, JOLIET AND EASTERN RAILWAY COMPANY, Defendant.**

No. 86 C 6284.

United States District Court, N.D. Illinois, E.D.

Sept. 16, 1988.

John C. Sands, Chicago, Ill., for plaintiff.

George W. Gessler, Terence E. Flynn, Gessler, Wexler, Flynn, Laswell & Fleischmann, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Plaintiff Eugene Molnar, forty years of age, brought suit against his employer the defendant Elgin, Joliet and Eastern Railway Company ("Elgin"), under the Federal Employer's Liability Act, 45 U.S.C. §§ 51–60 (1982) ("FELA"), and the Safety Appliance Act, 45 U.S.C. § 4 (1982), for damages resulting from injuries suffered in a crossing accident. In separate trials, a jury first found for Molnar on the issue of liability, then awarded him $859,110 for damages. Pursuant to Rule 59 of the Federal Rules of Civil Procedure, Elgin brings a motion for a new trial on the issue of damages.[1] For the reasons noted below, we deny the motion, conditional upon Molnar's acceptance of a remitittur.[2] The defendant also raises objections to certain items on Molnar's bill of costs. We rule on each item as indicated below.

### Facts

Molnar fell from a train car when a grab iron he was holding gave way. He was knocked unconscious, treated, released, and he returned to work shortly thereafter. He continued to work for more than a year after the accident but experienced severe pain in his neck, back and limbs. He sought medical treatment during this period from Dr. Bernardo Saavedra. However, the treatment prescribed proved ineffective. He changed doctors and came under the care of Dr. Ernest Stiller. New tests revealed degenerated intervertebral discs in Molnar's neck and lower back, causing pain in the back and limbs. Dr. Stiller dissolved the discs in the lower back with a fluid and referred Molnar to Dr. Ernesto Zelaya, a neurosurgeon, who performed an operation (laminectomy) removing the discs in Molnar's neck. This resulted in improvement in Molnar's condition, relieving to a degree the pain in his arm. At the time of trial, he was still undergoing physical therapy for residual numbness and weakness in his arm. Molnar has continued to have problems with his lower back, and Dr. Stiller testified at trial that a surgical procedure to fuse the vertebrae in Molnar's low-

1. Elgin raises several grounds in support of its motion but only pursues three of them in its supporting memoranda. We will consider in detail in this opinion only those three. We reject the others.

2. In cases of ordinary remitittur, the court must give the plaintiff the option of either accepting the remitittur or having a new trial. *McKinnon v. City of Berwyn*, 750 F.2d 1383, 1392 (7th Cir.1984).

er back may be necessary in order to enable him to put pressure on his back and to relieve his pain. During this period, Molnar also had minor operations on his wrist and elbow.

## I. Misrepresentation/Misconduct of Plaintiff's Counsel

■ Elgin argues in support of its motion that Molnar's counsel materially misrepresented the medical evidence in his closing argument by stating, "[h]e's lost his pension, his full pension, because he doesn't get credit unless he works. And the doctors have indicated that he is never going to be able to go back to work with the railroad." Record at 599. Misconduct of counsel justifies a new trial where the misconduct prejudiced the adverse party. *Wiedemann v. Galiano*, 722 F.2d 335, 337 (7th Cir.1983). The trial court's discretion is involved in determining whether or not the trial was fair to the moving party. *Id.*

Initially, it is pertinent to observe that the Seventh Circuit has held that in some cases where a party fails to voice its objection at trial, thus allowing the trial court to ameliorate the situation by a curative instruction, the prejudicial comments are not fundamental error which require reversal. *Gonzalez v. Volvo of Am. Corp.*, 752 F.2d 295, 298 (7th Cir.1985). The transcript of record in the instant case discloses no such objection by Elgin to Molnar's counsel's closing remarks. Nevertheless, notwithstanding Elgin's lack of contemporaneous objection, Elgin has failed to show the plaintiff's counsel's remarks were prejudicial.

## II. Causation

■ The defendant claims that the verdict is against the weight of the evidence because the plaintiff did not establish a causal connection between the accident and the medical conditions from which he now suffers. We disagree. Under the FELA, the standard for causation is comparatively weak, requiring only that the plaintiff show that employer negligence played any part, however small, in producing the injury or death for which damages are sought. *Rogers v. Missouri Pacific R.R. Co.*, 352 U.S. 500, 506, 77 S.Ct. 443, 448, 1 L.Ed.2d 493 (1957). Both of Molnar's physicians testified, in response to pointed questions from the plaintiff's attorney, that the lower back and neck conditions for which they treated him could have been caused by the trauma he suffered in the accident. Record at 382–383, 441. This is ample evidence that the accident played a role in producing Molnar's back and neck conditions.

While we agree with the defendant that the plaintiff did not establish causation as to the operations on Molnar's wrist and elbow, we find that these matters were insignificant relative to the seriousness of Molnar's neck and lower back conditions. They could only have had a negligible impact on an award of the size justified by damages resulting from Molnar's neck and back conditions.

The operation on Molnar's elbow was only mentioned twice. Dr. Stiller performed the operation, but was asked no questions about it. Dr. Zelaya mentioned that he noticed a cast on Molnar's elbow. Record at 389–390. Molnar mentioned the operation but was only asked to show the jury the scar. Record at 307–308. None of the medical details were explored. It was obviously a peripheral matter.

There is a little more testimony about the operation on Molnar's wrist.[3] The defend-

---

**3.** Record at 468–470:

Q. Did you perform any surgery before you sent him to—before you decided that he should be turned over to a doctor who would possibly do neck surgery?

A. Mr. Molnar had a slowing of the nerve in and about the wrist area of his hand, which is common in injuries of this kind which would be associated with the injury to the neck area. We already had shown a ruptured disk in the neck up here which caused a C6

impinging syndrome down the arm. We knew that to be a fact electrically, and a patient who has pain in the shoulder area as Mr. Molnar did, really can't—and this may funny—really has a difficult time distinguishing whether that pain is radiating to the shoulder from the neck or from a pinching of a nerve in the wrist going up to the shoulder. And we have evidence that there was pinching of the nerve in the wrist, too.

ant claims that Dr. Stiller testified that the pain in Molnar's arm was caused by a pinched nerve in his wrist, not pinching of the nerves in the neck. This is not the full story. Dr. Stiller testified that *both* the pinched nerves in the neck and the wrist could cause pain in the arm. Dr. Stiller performed the operation on Molnar's wrist in the hope that it would relieve the pain sufficiently to obviate surgery on Molnar's neck. It did not, however. Record at 470. *See generally* n. 3. Since the pinched nerve in the wrist and the subsequent operation had no significant effect on Molnar's other conditions, the fact that the plaintiff did not establish causation is of no consequence to an award of the size justified by the neck and lower back conditions. Failing to establish causation with respect to the wrist and elbow conditions, therefore, does not warrant a new trial.

## III. Excessiveness

■ A district court should set aside a jury verdict if it is "grossly excessive," *Abernathy v. Superior Hardwoods, Inc.,* 704 F.2d 963, 971 (7th Cir.1983) (Posner, J.), "monstrously excessive," or if there is "no rational connection between the evidence on damages and the verdict." *Joan W. v. City of Chicago,* 771 F.2d 1020, 1023 (7th Cir.1985) (following *Abernathy* ). To determine if a particular award falls within one of these categories, it follows that the court must be able to consider and weigh the evidence for itself. *Cf. Spanish Action Comm. v. City of Chicago,* 766 F.2d 315, 321 (7th Cir.1985) (court can weigh evidence, credibility of witnesses, on motion for new trial). *See also* 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2806 at 45, § 2807 at 51–52.[4]

In our charge to the jury, we listed the following elements of damages: (1) Present cash value of reasonable expenses of medical care (past and future), Record at 620; (2) Value of earnings lost, Record at 620; (3) Past and future pain and suffering, Record at 620; (4) Disability and disfigurement, Record at 620; and (5) Present value of future lost earnings, Record at 620–621. We believe the following to be the maximum amounts the jury could have awarded for the first four elements of damages: (1) $60,000 for medical expenses, Record at 484; (2) $97,653 for lost past earnings and benefits, Record at 348; (3) $50,000 for pain and suffering, Record at 281, 284, 290–291, 293, 298; (4) $50,000 for disability, Record at 308–309. This leaves, out of the

Okay. Now to unpinch that nerve in the wrist is a small operation and risk as far as the patient is concerned.

Q. What is that called?

A. It is carpotunnelitis and it is a procedure that involves unearthing this nerve down in the wrist out of this tunnel area. And doing little microdissection on the nerve there. So I proposed to Mr. Molnar that both these conditions could impinge on his shoulder. And if we try this simple procedure to see if we could alleviate this and maybe save him a bigger operation.

Q. Okay. Now that is done on approximately—was done in Starke Memorial Hospital the admission of July 14, 1986, according to the records, Doctor?

A. Fine. We did it sometime in that area.

Q. Okay. You performed that operation, did you not, sir?

A. Yes, I did.

Q. He was discharged July 15, 1986? (Brief pause.)

BY MR. SANDS:

Q. When did you next see Gene Molnar, Doctor?

A. Let me see. He was seen in June of 1986.

Q. He was seen early in June and late in June. Then he was seen in October—let's see, '86.

Q. All right. Now, Doctor, did you—

A. He was seen in July also.

Q. Did he continue to have problems in his neck and arm area?

A. Yes, he did.

Q. Did you feel that other tests were in order?

A. At that point in time after the carpotunnelitis had given him—the operation on the wrist had given him some relief, but was insufficient in relieving the overall pain complex in the shoulder. I had him seen by Dr. Zelaya in Valpo, as I mentioned before.

I believe Dr. Zelaya may have performed a myelogram. That is just from recollection.

4. Judge Eschbach recently suggested in dicta that assessing the excessiveness of an award by comparing it to awards in similar cases is a task best left to the appellate courts. *In re Innovative Constr. Sys.,* 793 F.2d 875, 887 n. 11 (7th Cir.1986) (Eschbach, J.). *But see Lux v. McDonnell Douglas Corp.,* 608 F.Supp. 98, 105 (N.D.Ill. 1984) (wrongful death award deemed excessive by comparison to similar cases).

total award, approximately $601,000 for lost future wages and benefits. This amount is grossly excessive in light of the evidence.

We do not minimize the seriousness of Molnar's situation by reaching this conclusion. He has apparently suffered a substantial injury which will affect him well into the future. However, we do not feel that an award amounting to nearly 70 percent of the amount requested by his attorney is supported by the evidence.

The specific amount requested for lost future wages and benefits was taken from the testimony of Professor Arthur Dobbelaere, an economist. The figure calculated by Professor Dobbelaere—$888,905—assumes that Molnar will not earn any income in the future. Record at 351, 361. And so for the jury to award nearly 70 percent of this amount, its members must have assumed that Molnar would not be able to return to work as an engineer, thereby losing his benefits, and that he would only be able to earn a small fraction of what he was earning as an engineer. It is with these conclusions that we take issue.

There are several reasons for this. The testimony on Molnar's future employability is, at best, uncertain. Dr. Stiller, Molnar's orthopedic surgeon, testified that Molnar would be able to tolerate the physical demands of jobs requiring heavy labor if the spinal fusion procedure he recommends is successful. Record at 481–482. But this procedure is only successful about half the time. Id. Dr. Stiller discounted Molnar's neck injuries with regard to doing heavy work.[5] Record at 482. On the other hand, Dr. Zelaya, Molnar's neurosurgeon, testified that he recommends patients with neck problems similar to Molnar's avoid physically demanding work, suggesting that Molnar would not be able to return to his job even if the spinal fusion procedure were successful. Record at 393–394. Given this conflicting testimony, we do not feel that the jury could have reached a sound conclusion about Molnar's ability to return to his former occupation or to perform physically demanding labor.[6]

There is similar uncertainty concerning the prognosis for Molnar's neck injuries. Molnar testified that after Dr. Zelaya removed the discs in his neck, he felt as though he had a "new arm," with some residual numbness and weakness. Record at 305, 306. He is currently undergoing therapy for these remaining problems. Record at 306. Dr. Zelaya testified that he "had a general impression of improvement" as to Molnar's condition after the neck operation, but that it will take a year to see if the residual problems can be alleviated. Record at 395. Because nerves heal slowly, he testified, the residual problems Molnar is experiencing may be consistent with a "normal" recovery. Record at 395. Here again, the jury has an uncertain basis on which to reach conclusions as to how Molnar's residual arm problems will affect his ability to work in jobs that require heavy labor or dexterity.

In addition to the uncertainty about Molnar's medical prognosis, other evidence does not support an award of this size. Dr. Stiller testified that the main problem those with injuries similar to Molnar's have is with prolonged sitting or standing. Record at 435. He suggested a mechanic's job as being suitable for someone with these types of injuries (i.e. a job that requires regular changes in body position). Id. Mol-

---

5. Dr. Stiller: "We have found that an athlete or people who perform—basketball players, football players and people who perform heavy duty labor, such as truck drivers and people such as that, their best chance of getting back to what they do is in that procedure (the spinal fusion). They have had better luck with the fusions and simple discectomies because of the heavy load in the low back. It is a heavy weight bearing load.

Not so much in the neck, but in the low back. And at that point I believe that Mr.

Molnar probably without that will have no chance of returning to his livelihood; and with that probably a fifty-fifty chance. Unfortunately that is about the best we can give him." Record at 482 (emphasis added).

6. We would be hesitant to grant defendant's motion based on conflicting testimony alone, as it is for the jury to decide who to believe and disbelieve. We consider it, therefore, in connection with the other reasons noted.

nar testified that he had been an assistant mechanic's helper before he became an engineer. Record at 286. He also testified that he had previously worked in a supervisory capacity, hiring and training security personnel for the railroad. Record at 287. He did testify that the physical demands of that particular position—apprehending shoplifters, for example—would preclude him from returning to it. *Id.* But the fact remains that Molnar obviously has more job skills than only those necessary for being an engineer including, apparently, some managerial skills. Taking into account the uncertainty concerning the extent of Molnar's physical disability and the evidence as to Molnar's other job skills, we do not feel that such a large award is supportable.

There are two other matters which have a bearing on this issue. First, Dr. Stiller testified that Molnar would have great difficulty finding a job because of problems with any pre-employment physical and objections from the company's insurance carrier. This would be the case even if the spinal fusion procedure was successful. Record at 484–485. He also testified that if the procedure was not successful, any job Molnar might get would be less well compensated. Record at 485. We regard this testimony as essentially speculative and do not feel that a jury should base such a large award on this testimony alone. Second, defendants charge that Molnar's attorney made a material misrepresentation to the jury in his closing statement. He said, *inter alia,* "the doctors have indicated that he is never going to be able to go back to work with the railroad." Record at 599. While we are not prepared to hold that this misstatement unduly prejudiced the jury,[7] it may have contributed marginally to its perception that such a large award was justified.

To conclude, Elgin's motion for a new trial on damages is denied, conditional on Molnar's remittance of $201,000. This brings the award for lost future earnings and benefits down to $400,000, or roughly 45 percent of what Molnar requested, an amount which this Court regards as the most that could have been fairly awarded in light of the evidence.

### Costs

Molnar requests costs under 28 U.S.C. § 1920 (1982). In a recent decision, the Supreme Court held that a court may only tax those costs specifically authorized by statute. *Crawford Fitting Co. v. J.T. Gibbons, Inc.,* 482 U.S. 437, ——, 107 S.Ct. 2494, 2499, 96 L.Ed.2d 385 (1987). It further held, at least with regard to 28 U.S.C. § 1920, that any discretion the court may have pursuant to Rule 54(d) of the Federal Rules of Civil Procedure is limited to refusing to tax costs authorized by that statute. *Id.* 107 S.Ct. at 2495 (disapproving dictum in *Farmer v. American Arabian Oil Co.,* 379 U.S. 227, 235, 85 S.Ct. 411, 416, 13 L.Ed.2d 248 (1964)).

Once a statutory basis for taxing the cost is established, the Court must determine if the cost was "reasonably necessary to the conduct of the litigation and ... [whether] the amount of the cost ... [was] reasonable." *State of Illinois v. Sangamo Construction Co.,* 657 F.2d 855, 864 (7th Cir.1981) ("*Sangamo*"). As detailed below, there is a statutory basis for taxing each of the costs objected to by Elgin. The only question is, then, whether each item objected to by Elgin meets the reasonableness standard imposed by the Seventh Circuit. Considering each item in turn:

■ 1. *Copies of Molnar's medical records ($348.93).* Elgin objects to these because only a small portion of them were used at trial. In *Sangamo,* the court held, "The expense of copying materials reasonably necessary for use in the case are recoverable costs under 28 U.S.C. § 1920(4). The underlying documents need not be introduced at trial in order for the cost of them to be recoverable." *Sangamo,* 657 F.2d at 867 (the copies in question included discovery documents). *See also Independence Tube Corp. v. Copperweld Corp.,* 543 F.Supp. 706, 722 (N.D.Ill.), *aff'd on other grounds* 691 F.2d 310 (1982), *rev'd on other grounds,* 467 U.S. 752, 104

---

**7.** *See* discussion on misrepresentation above.

S.Ct. 2731, 81 L.Ed.2d 628 (1984). This Court finds that copies of Molnar's medical records were reasonably necessary to the case in order for the attorneys to prepare for depositions and to provide further evidence to the jury of Molnar's medical conditions. This cost is allowed.

2. *Transcripts of depositions ($846.40)*. These are recoverable under 28 U.S.C. § 1920(2). The defendant objects to the costs of transcripts of depositions of witnesses who testified "live" at the trial and those whose depositions were presented by videotape. In *Sangamo*, the court held, "[i]t is well established that the charges of the court reporter for transcripts of the trial and of depositions reasonably necessary for use in the case are recoverable upon a proper showing as provided in 28 U.S.C. § 1924." 657 F.2d at 867 (citation omitted). Generally, transcripts of depositions are necessary so that an attorney may impeach a witness testifying at trial. In regard to those depositions presented by videotape, a transcript is necessary so that an attorney may decide which portions of the videotape to present to the jury. These costs are allowed.

■ 3. *Witness fees for Barbara Sue Rosser ($48.00)*. Fees for witnesses are recoverable under 28 U.S.C. § 1920(3). The defendant objects to this cost because this witness was never called at trial, and there was "never any suggestion" that she would be. It has been held that witness fees may be taxed even if the witness did not testify or attend the trial. *Independence Tube Corp.*, 543 F.Supp. at 722; *Spanish Action Committee of Chicago v. City of Chicago*, 811 F.2d 1129, 1138 (7th Cir.1987). Nevertheless, we do not feel that this witness was reasonably necessary to the plaintiff's case. This cost is not allowed.

4. *Cost of trial transcript for opening day of liability trial ($32.00)*. This cost is recoverable under 28 U.S.C. § 1920(2). The defendant contends that this transcript (of the attorneys' opening statements) was obtained only for the convenience of the plaintiff's attorney and thus should not be taxed. We agree. *Sangamo* elucidates the appropriate standard: "It is well established that the charges of the court reporter for transcripts of the trial ... reasonably necessary for use in the case are recoverable...." 657 F.2d at 867 (citation omitted). This cost was not reasonably necessary to the case. Only the first day of the trial was obtained, and no evidence was taken on that day. The transcript was apparently obtained merely for the plaintiff's attorney's convenience and so should not be taxed.

### Conclusion

Elgin's motion for a new trial is denied, conditional on Molnar's acceptance of a remittittur of $201,000. Within ten days, Molnar is to file a written submission, with service on Elgin, advising the Court whether he will accept this remittittur or proceed with a new trial on the issue of damages. All of the items on Molnar's bill of costs are allowed, except for witness fees for Barbara Sue Rosser and the cost of the trial transcript for the opening day of the liability trial. It is so ordered.