**In re ELMENDORF BOARD CORPORATION, Debtor.**

**Bankruptcy No. 84–069.**

United States Bankruptcy Court, D. New Hampshire.

Jan. 31, 1986.

Mark Berman, Boston, Mass., Michael Moyers, Concord, N.H., for debtor.

Daniel Sklar, Manchester, N.H., for petitioning creditors.

Joseph Ryan, Brown Rudnick Law Offices, Boston, Mass., for trustee.

David J. Ferrari, Natick, Mass., Trustee/Accountant.

Steven Greene, Boston, Mass., for the Creditors Committee.

Mark Vaughn, Manchester, N.H., for Aetna Life, Prudential, & Toronto Dominion Inv.

## MEMORANDUM OPINION ON FEES

JAMES E. YACOS, Bankruptcy Judge.

The court previously by Order entered December 31, 1985 in this Chapter 11 case has allowed final fees and expenses to various attorneys and other parties involved in this Chapter 11 proceeding. Two of the fee applications involve certain legal issues which require further detailed elaboration which is now provided in this opinion.

The fee requests in question, to which the U.S. Trustee raised certain partial objections, include a fee request of $270,-107.25 by Brown, Rudnick, Freed & Gesmer, Esquires, attorneys for the Chapter 11 trustee; and fee request of $98,556.75 by Riemer & Braunstein, Esquires, attorneys for the official creditors committee.

The Brown, Rudnick firm's application recites 1,479 hours of attorney time and 151 hours of paralegal time, which at their regularly hourly rates would indicate a fee of $154,347.00. They request the higher fee allowance on the grounds that their services rendered in the context of this particular case justify a "fee multiplier" of 1.75, i.e., a 75 percent increase over their base hourly rate fee as a "premium" fee award.

The fee application by Riemer & Braunstein indicates a total of 433 hours of attorney time, which would result in a billing of $65,722.50 at regular hourly rates. They also request a higher fee allowance by virtue of a "fee multiplier" of 1.50 which they contend is justified on the facts of this case.

No party in interest involved in this outstandingly successful Chapter 11 reorganization, including the U.S. Trustee, has raised any objection to the allowance of the basic "lodestar" fees, i.e., reasonable hourly rates times reasonable hours expended, claimed by the attorneys for the Chapter 11 trustee and the creditors committee.

The U.S. Trustee has raised legal questions regarding the allowance of the full fee multipliers requested by counsel in light of certain recent decisions by the U.S. Supreme Court and the First Circuit Court of Appeals, i.e., *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891, (1984); *Wildman v. Lerner Stores Corporation*, 771 F.2d 605 (1st Cir.1985); *Boston & Maine Corp. v. Sheehan*, 778 F.2d 890 (1st Cir.1985); *Boston & Maine Corp. v. Moore*, 776 F.2d 2, (1st Cir.1985). No other party in interest, including a subordinated creditor who will receive the remaining funds in this estate after fees are paid, has raised any objection to any of the fee requests, including the "premium" request of the attorneys for the trustee and creditors committee.

### THE FACTS

An involuntary petition was filed against the debtor on February 22, 1984. There-

after the debtor on March 22, 1984 consented to the bankruptcy filing and filed its own voluntary Chapter 11 petition. The debtor corporation was engaged in the production of oriented strandboard, a new product developed under some German patents which seeks to use low-cost wood products to produce the functional equivalent to ordinary plywood. At the time this case was filed the debtor was losing approximately $100,000 a month in its operations. The debtor's plant and equipment were appraised at approximately $2,500,-000, with blanket liens against the plant and equipment covering a secured debt exceeding $30,000,000.

The blanket liens, including all cash collateral, were held under a complicated financing package whereby the First National Bank of Boston, together with a number of major insurance companies, held the secured debt with ninety percent of the same guaranteed by the Farmers Home Administration of the United States Department of Agriculture. The insurance companies also held equity participations in the debtor corporation, arising from their initial investment in the original organization of the oriented strandboard venture. These insurance companies in that capacity have been referred to as the "Investors" throughout these proceedings.

The debtor's attempts to negotiate some sort of restructuring of the secured debt, which would require approval of the FmHA agency, foundered for a number of reasons, including the sheer magnitude of the undersecured debt in question. For several months the FmHA, like the "Phantom of the Opera", made noises which were heard indirectly in these proceedings. The agency itself never materialized either directly or indirectly prior to the appointment of the trustee to take a firm position on the crucial question of whether it would agree to a very substantial reduction of the secured debt level for reorganization purposes. Suffice it to say that there were noneconomic obstacles to an immediate recognition that the agency had guaranteed $30 million in loans on a plant which ultimately proved to have a $5 million value. It was represented at a hearing in May of 1984 that the agency would not agree to a "structured settlement" but would agree only to a public sale at "fair market value."

By June of 1984 the debtor was still operating at a loss of approximately $80,-000 per month. The debtor recommended that operations be closed down. The debtor noted that even if the secured creditors were held to a secured claim at the collateral value, they would have such a large unsecured deficiency claim that they would control any possible plan confirmation.

On June 12, 1984, the court authorized the appointment of a Chapter 11 trustee and directed that he investigate the operational questions and report further at a previously-scheduled hearing on June 26, 1984 on various motions to lift the automatic stay filed by the secured creditors. It is fair to state that at the conclusion of the June 12th hearing it was assumed by most of the major interested parties that operations would have to cease and that lack of adequate protection would require lifting of the automatic stay. It was also clear that there were no "free assets" in this estate at that point to assure that administrative expenses would ever be paid.

In an extraordinary burst of activity between those two dates, the trustee and his counsel were able to present at the June 26, 1984 hearing a convincing factual presentation to the effect that even though the operation was losing money it would actually cost more money *net* over the next two to three months if the plant were closed down at that time. The unique nature of the machinery and equipment involved, unavoidable costs of preservation pending a foreclosure sale, and other factors conspired to produce this unusual result. The trustee also believed that the loss operation could be turned around to a break-even point within that period. The court denied the stay relief motions at that hearing, without prejudice of their being reasserted 60 days thereafter.

While the trustee did in fact substantially reduce the operating losses during the

next two months, this by itself did nothing to eliminate the severe problems of the massive secured debt barring any feasible prospects for a reorganization plan.

A joint venture organized by the petitioning creditors and other parties did bring forward a plan in August of 1984 which would have paid administrative expenses and fees and would have provided some dividend to general creditors. Under the plan the ELV group would have funded up to $100,000 for fees and expenses of the trustee and his counsel, and up to $25,000 for fees and expenses of the creditors' committee counsel. An additional $400,000 would be provided for a dividend to general unsecured creditors.

While the ELV plan initially lists the unsecured creditor group as $1,644,300 in amount, the projected dividend would have been severely diluted if certain assumptions as to successful outcome of adversary positions (already taken by the trustee) were not borne out. Additional claims that could have ended up "sharing in the $400,-000 pot" included claims in excess of $2.6 million by the Swiss Bank Corporation, and a claim in excess of $7.0 million by General Electric Company for the contemplated rejection of a "tax lease" it had obtained from the debtor.

The ELV plan also assumed a favorable outcome on its proposed "cramdown" treatment of the secured claims of FNBB and the insurance companies. This provision was quite complicated and became more so in the event of a § 1111(b) election by those substantially undersecured parties. Even if the election for full treatment as a secured claim was not made, their deficiency claim in excess of $25 million obviously would wreak havoc to any dividend to general creditors unless that claim could be successfully subordinated or otherwise provided for.

It was apparent that the ELV plan on confirmation would have involved considerable litigation and appeals, particularly with the insurance companies and GE, before *any* dividend could have been paid to general creditors. The only thing certain under the ELV plan was that the attorneys for the trustee and the committee would be paid their fees and expenses.

The trustee and his counsel opposed the joint venture's plan of reorganization and ultimately were able to bring forward for confirmation on October 30, 1984 an auction sale of the plant and equipment under a ingenious series of settlement agreements with the various major contending interests. The settlements and sale made possible ultimately a reorganization plan confirmed on June 11, 1985 under which the trustee is presently completing the payment of all unsecured creditors in full.

The auction sale in October of 1984 resulted in a high bid of $5,150,000. This amount was augmented by $270,000 received from the sale of other assets and the net cash on hand from operations. In addition the trustee received $900,000 from the investors by virtue of various settlements, and $100,000 from a foreign investor group under a separate settlement, together with $30,000 in miscellaneous smaller settlements. The total funds thus generated, i.e., approximately $6,450,000, resulted under the various settlement agreements in a distribution of $4,775,000 to secured creditors, leaving approximately $1,675,000 for distributions to unsecured creditors in various classifications and categories. The result has been that the general trade creditors in this estate are being paid in full by virtue of the foregoing, in a case in which at the outset it appeared that there was no prospect whatsoever for any sizeable dividend to general creditors. A small surplus remaining in the estate after the payment of all fees and expenses will go to the Swiss Bank Corporation, which has accepted a subordinated position with regard to its $2,600,000 claim.

It is not necessary here to detail all of the negotiations and strategic positions taken by the trustee and his counsel, supported by the creditors committee, in order to achieve the favorable settlement results that permitted the reorganization plan to succeed. Much of the detail is set forth in an adversary complaint filed by the trustee

on August 27, 1984 against the First National Bank of Boston, the insurance companies, and a number of other defendants seeking to disallow or subordinate claims. A copy of that complaint is attached as Annex "A" to this opinion and sufficiently demonstrates the ingenuity and creative effort which underlay the successful negotiations with those parties.

It should be added that a large part of the success of the negotiations involved taking advantage of a unique issue relating to a "tax lease" which the debtor had granted to General Electric Company prior to the bankruptcy filing. Since the investors had obligated themselves to indemnify General Electric Company for any loss of tax advantages, should the debtor subsequently terminate its operations, or not transfer them to a qualified successor-operator, the trustee was able to negotiate substantial settlement payments by the investors to avoid that result. The sale conditions expressly required that the successful bidder be a party qualified to continue operations in the sense necessary to permit the tax lease benefits to continue in effect for General Electric Company. This leverage was skillfully used by the trustee and the committee in their negotiations with the major parties involved in this reorganization.

### THE LAW

It is well established in this circuit that a reasonable fee will first be computed in accordance with "lodestar" method, i.e., a reasonable hourly rate applied to reasonable hours expended in rendering the necessary services. The Court of Appeals for the First Circuit in *Boston & Maine Corp. v. Moore*, supra, summarizes this concept as follows:

"The district court appropriately used the so-called 'lodestar' analysis to review the reasonableness of petitioner's charges since Moore and his firm billed on an hourly time-charge basis, as they had advised the B & M, at the outset, they would do. *Compare Boston & Maine Corp. v. Sheehan, Phinney, Bass*

*and Green, P.A.,* [778 F.2d 890, 894–96] No. 84–1912, slip op. at 10–15 (1st Cir. Octo. 15, 1985). Under the methodology pioneered by the Third Circuit in *Lindy Brothers Builders, Inc. v. American Radiator & Sanitary Corp.,* 487 F.2d 161 (1973) (*'Lindy'* I'), and adopted by this circuit in *Furtado v. Bishop,* 635 F.2d 915, 919–20 (1st Cir.1980), the fee-setting court first establishes a 'threshold point of reference' or the 'lodestar,' which is the number of hours reasonably spent by each attorney multiplied by his reasonable hourly rate. *See, e.g., Grendel's Den, Inc. v. Larkin,* 749 F.2d 945, 950 (1st Cir.1984). This lodestar can then be adjusted up or down to reflect a variety of factors, such as delay in payment, quality of representation, and the results obtained, if they have not already been taken into account in computing the lodestar. *See, e.g., Blum v. Stenson,* [465 U.S. 886] 104 S.Ct. 1541, 1548–50 [79 L.Ed.2d 891] (1984); *Miles v. Sampson,* 675 F.2d 5, 8 (1st Cir.1982); *Furtado,* 635 F.2d at 920."

In the present case there is no serious issue raised as to the fact that the hours expended were reasonable in this case and the hourly rates of the attorneys involved on these fee requests were in fact reasonable rates for the services rendered. These hourly rates work out to approximately $95 per hour on average for the attorneys for the trustee and $150 per hour on average for the attorneys for the creditors' committee.

The U.S. Trustee's objection to these fee requests is based instead on the contention that a fee multiplier in excess of 1.25 on the facts of these cases is not justified under his reading of the Supreme Court's ruling in *Blum* to the effect that certain factors, such as the quality of representation, and the complexity and novelty of issues, are appropriate only in determining the lodestar fee and are not here available to justify an enhanced or bonus fee above the lodestar figure.

It is true that in *Blum*, dealing with the analogous situation of a "reasonable fee"

to be allowed under 42 U.S.C. § 1988, the court did comment:

"The reasons offered by the District Court to support the upward adjustment do not withstand examination. The novelty and complexity of the issues presumably were fully reflected in the number of billable hours recorded by counsel and thus do not warrant an upward adjustment in a fee based on the number of billable hours times reasonable hourly rates. There may be cases, of course, where the experience and special skill of the attorney will require the expenditure of fewer hours than counsel normally would be expected to spend on a particularly novel or complex issue. In those cases, the special skill and experience of counsel should be reflected in the reasonableness of the hourly rates. Neither complexity nor novelty of the issues, therefore, is an appropriate factor in determining whether to increase the basic fee award.

"The District Court, having tried the case, was in the best position to conclude that 'the quality of representation was high.' In view of the reputation of the Legal Aid Society and its staff, we have no doubt that this was true. The 'quality of representation,' however, generally is reflected in the reasonable hourly rate. It, therefore, may justify an upward adjustment only in the rare case where the fee applicant offers specific evidence to show that the quality of service rendered was superior to that one reasonably should expect in light of the hourly rates charged and that the success was 'exceptional.' See *Hensley,* [461] US [424] at [435], 76 L.Ed.2d 40, 103 S.Ct. 1933 [1940]. Respondents offered no such evidence in this case, and on this record the District Court's rationale for providing an upward adjustment for quality of representation is a clear example of double counting." (465 U.S. at pp. 898–899, 104 S.Ct. at pp. 1548–1549, 79 L.Ed.2d at pp. 901–902)

The First Circuit itself has recently summarized the state of the law on fee awards after *Blum* in its *Wildman* decision as follows:

"Leaving aside for the moment, the contingency fee factor, we do not think that under *Blum* either the court's reasons or the trial record justified a multiplier based on the difficulties of the action, or the novelty of issues. In *Blum,* decided after the district court's decision, the Supreme Court held that '[n]either complexity nor novelty of the issues ... is an appropriate factor in determining whether to increase the basic fee award.' [465 U.S. at 898, 104 S.Ct. at 1549] 52 U.S.L.W. at 4380. The Court reasoned that whatever work was required by the issues would be fully reflected in the number of billable hours recorded and that 'quality of representation' is generally reflected in the reasonable hourly rate. *Id.* The Court did recognize, however, that an upward adjustment based on the performance of the lawyer(s) may be justified, but 'only in the rare case where the fee applicant offers specific evidence to show that the quality of service rendered was superior to that one reasonably should expect in light of the hourly rates charged and that the success was 'exceptional.'" *Id. See also Hensley,* 461 U.S. at 433 [103 S.Ct. at 1939]. In *Garrity v. Sununu* 752, F.2d 727, 739 (1st Cir.1984), we noted that upward adjustments for quality of representation after *Blum* 'are to be few and far between.' The case here hinged on whether the jury believed plaintiff or the person who discharged him, Karl Margolis. We do not doubt that Attorney Nachman's skill and experience, especially his cross-examination of Margolis, had a lot to do with the verdict in favor of plaintiff. Skill and experience as a litigator are, however, Nachman's stock-in-trade and he was paid his asking price." (771 F.2d at p. 610)

It is awkward that this court should have to face one of the "few and far between" cases in its first fee decision following the recent pronouncements by the court of appeals but in my judgment this proceeding is precisely such a case. Under any measure

this reorganization was successful far beyond any prospects for success that existed at the time the case was filed in February of 1984, and more importantly at the time the trustee was appointed in June of 1984. The attorneys were not only presented with complex and new issues including the "tax lease" device only recently enacted by Congress, and as yet untested in the bankruptcy arena, but the attorneys were under severe time pressure to master the facts involved and to attempt to get into a negotiating stance against some formidable national corporations and international adversaries.

It is also important to note in this case that the attorneys involved could have proceeded with the minimal plan offered by outside parties in August of 1984, under which their administrative fees and expenses at least would have been paid, but chose instead to wage a vigorous battle against various parties to force negotiation of a plan that ultimately resulted in full pay-out of all general creditors. If the bankruptcy court is going to have the services of attorneys who will perform in that fashion it must recognize in those cases—few and far between as they may well be—that such attorneys should be rewarded commensurate with the type of compensation they would seek in the nonbankruptcy world for similar services.

It is my judgment that the successful results obtained in this reorganization by the attorneys involved are truly "exceptional" within the meaning of the pronouncements in the *Blum* and *Wildman* decisions; that the quality of service rendered was superior to that reasonably expectable for the relatively low hourly rates charged for the attorneys involved; and that the foregoing is amply documented by the respective fee applications and attachments together with the record in this case.

Alternatively, even if the premium fees on these applications must be supported simply on the "risk of no payment" factor, it is now recognized in this circuit that such factor does in a proper case justify the enhanced fee. As stated by the court of appeals in the *Wildman* case:

"We now turn to the question of whether a multiplier can be justified solely because of the contingent nature of the action. In *Blum* the attorney was not working on a contingency basis and the majority opinion, while noting the contingency issue, explicitly did not decide the propriety of adjusting the lodestar figure upward to encourage attorneys to take cases that involve a risk of nonpayment."

\* \* \* \* \* \*

A canvass of the post-*Blum* cases shows a difference of opinion among the circuits as to whether there can be an upward adjustment of the hourly rate fee because of contingent-fee risk factors. Four of the six circuits that have considered the question have held that there can be such an increase. The Ninth Circuit in *LaDuke v. Nelson*, [762] F.2d [1318] (9th Cir.1985), upheld the district court's reliance on Justice Brennan's concurring opinion in *Blum* for applying a 20 percent multiplier. In *Delaware Valley Citizens' Counsel for Clean Air v. Pennsylvania*, 762 F.2d 272 (3d Cir.1985), The Third Circuit found that the use of multipliers met the *Blum* standards, and also found that the contingent nature of the fee supported an upward adjustment where the contingency risk had been identified by plaintiff's counsel. *See also Hall v. Borough of Roselle*, 747 F.2d 838, 842–43 (3d Cir. 1984) (contingency fee factor approved but not applied because case was settled prior to trial). The Eighth Circuit has held that a multiplier of 30 percent met the *Blum* test due to the contingent nature of the success, the public importance of the result, and the novelty and difficulty of the issues. *Sierra Club v. Clark*, 755 F.2d 608, 620 (8th Cir.1985). The rule in the Eleventh Circuit is that; '[a] contingency fee arrangement may justify an increase in an award of attorney's fees.' *Jones v. Central Soya Company, Inc.*, 748 F.2d 586, 591 (11th

Cir.1984). The question in *Jones* was whether the results constituted 'exceptional success' under *Blum* and *Hensley.* Finding that the case was not taken on a contingency fee basis, the court held that the district court did not abuse its discretion in denying a multiplier.

"In *McKinnon v. City of Berwyn,* 750 F.2d 1383, 1392 (7th Cir.1984), the Seventh Circuit noted that *Blum* left open the question of whether the risk of losing is a permissible factor in judging 'exceptional success' and applied its own rule that the risk of losing alone does not justify a multiplier. The D.C. Circuit holds that the contingency fee factor does not normally justify an upward adjustment; it is permissible only in an exceptional case. *Laffey v. Northwest Airlines, Inc.,* 746 F.2d 4, 28–29 (D.C.Cir. 1984); *Murray v. Weinberger,* 741 F.2d 1423, 1427–29, 1431 (D.C.Cir.1984).

"This circuit has not addressed post-*Blum* the issue of an upward adjustment in attorney's fees based on the risk of nonpayment. In a pre-*Blum* case, we held that the contingent nature of the fee was one of the factors to be considered in an upward or downward adjustment. *Furtado v. Bishop,* 635 F.2d 915, 920 (1st Cir.1980)."

&ast; &ast; &ast; &ast; &ast; &ast;

"While the lodestar calculation may reflect the difficulty of the resolution of the issues involved in a case, as the Court indicated in *Blum* and *Hensley,* the lodestar figure alone does not differentiate between the case taken on a full retainer and a case in which an attorney spends many hours over a period of months or years with no assurance of any pay if the suit is unsuccessful. Even if the client ultimately prevails, the burden of supporting salaried employees and fixed costs during the course of the contingent litigation can be substantial.

&ast; &ast; &ast; &ast; &ast; &ast;

"We disagree with the holding of the Seventh Circuit in *McKinnon v. City of Berwyn,* 750 F.2d 1383, that the risk of losing does not justify a multiplier. In *McKinnon,* the court held that a risk bonus was inappropriate because 'it compensates attorneys, indirectly but effectively, for bringing unsuccessful civil rights suits, even though the attorney's fee statute is expressly limited to cases where the party seeking the fee prevails.' *Id.* at 1392. According to the *McKinnon* court, the logic of a risk adjustment leads to a multiplier that compensates an attorney for the cases he loses as well as wins, i.e., a lawyer with a one out of fifty chance of winning would get a multiplier of fifty to compensate him for the forty-nine similar cases he lost. We think such an analysis fails to consider the variables that may contribute to a lawyer's risk of loss as well as the relatively conservative multipliers that have been awarded by courts." (At pp. 611–613)

In the present case there was a clear and present danger, indeed a certainty, that counsel would be paid no fees whatsoever for their services unless they were successful in some manner in forging a successful reorganization. That in turn required dealing with assets subjected to a blanket lien more than ten times in excess of any then known values.

As indicated above, in the uncertain world of bankruptcy reorganization it is essential that the court and the parties be served by attorneys who will put their compensation considerations aside when necessary to vigorously pursue the rights of the otherwise unrepresented creditors in appropriate litigation when there are valid causes of action to pursue. If such attorneys are to serve in that fashion they should in all equity be rewarded appropriately when they are successful.

## CONCLUSION

On both grounds then, i.e., the "exceptional" results obtained and the "risk of nonpayment" contingency, I conclude that the requested premium enhancement over the "lodestar" fee level in the subject fee applications is justified in this *outstandingly* successful reorganization. I believe my opinion adequately sets forth the particular circumstances that take this case out of the category of Chapter 11 cases in

which a confirmed reorganization is achieved but in which that successful result is not truly exceptional. Not every fee applicant who subsequently comes to this court crying "Success! Success!" will go away with a premium. Such claims are to be carefully scrutinized, as the *Blum* and *Wildman* decisions instruct, and are by definition to be few and far between. However, this court acts as a court of equity and not as a bureau of statistics. The next fee case will of course be decided upon its particular merits.

I am aware that I have not paid homage in this opinion to the famous "twelve factors" that are supposed to also govern the setting of "reasonable fees" in both bankruptcy and nonbankruptcy cases. See, e.g., *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974); *King v. Greenblatt*, 560 F.2d 1024 (1st Cir.1977); *In re Casco Bay Lines, Inc.*, 25 B.R. 747 (1st Cir., Bk'y App. Panel, 1982); *Boston & Maine Corp. v. Sheehan*, 778 F.2d 890, 899 (1st Cir., October 15, 1985).[1]

While a colleague of mine, safely outside the limits of this circuit, has sardonically referred to those courts that take their fee directions "from the polestar, lodestar, and all other magnetic compasses" I do believe that the courts necessarily are coming to a realization that the full "twelve factors" approach can not be implemented without excessively time-consuming and often overlapping analytical exercises of inappropriate "hindsight" and "second-guessing." Cf. *Boston & Maine v. Moore*, 776 F.2d 2 (1st Cir.1985). See also *In re Casco Bay Lines, Inc.*, supra, at pp. 753–756.

Since logically a full application of *all* twelve factors from the *Johnson* case would literally *define* a reasonable fee before the "lodestar" approach could come into play (as to any enhancement or diminution) there has been a great deal of confusion as to how both approaches can be employed simultaneously. See, *In re Casco Bay Lines, Inc.*, supra, at pp. 753–760. Problems with the "twelve factors" formulation indeed led to the original development of the "lodestar" concept. See *Copeland v. Marshall*, 641 F.2d 880 (D.C.Cir. 1980).

It is obvious that some analytical synthesis of the "twelve factors" and the "lodestar" approaches is necessary if fee decisions are to be articulated in a clearer and more coherent manner. Fortunately, I do not have to face that task in the present case since there is no question that on any standard, as indicated above, the *base* fees requested here represent reasonable hourly rates applied to total hours reasonably expended. The sole question requiring detailed elaboration has been the *premium* enhancement issue.

Finally, the U.S. Trustee does note with regard to the application by Brown, Rudnick that even if the contingent nature of their compensation is a justification for an enhanced fee, that justification lapsed in August or September of 1984 when the basic settlements had been negotiated. The U.S. Trustee therefore contends that any services by the trustee's counsel thereafter in the formulation and implementation of the actual plan of reorganization should not support an enhanced fee. This position however ignores the reality of the situation in that the settlements had no meaning or effect until the actual sale of the plant and equipment was approved on October 30, 1984. In addition, there were many further services necessary to actually formulate and implement the plan of reorganization.

In any event, the court notes that the average hourly rate requested by Brown, Rudnick under their base fee calculation is approximately $95 an hour, whereas the

---

**1.** These factors are usually formulated as follows: (1) the time and labor required; (2) the novelty and difficulty of the issues; (3) the skill necessary to perform the services properly; (4) the preclusion of other employment; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or circumstances; (8) the amounts involved and the results obtained; (9) the experience, reputation and ability of the applicant; (10) the "undesireability" of the case; (11) the nature and length of the professional relationship with the client and (12) awards in similar cases. See *In re First Colonial Corp. of America*, 544 F.2d 1291 (5th Cir.1977), in which these factors were first applied in a bankruptcy case.

average hourly rate requested by the creditor's committee counsel in their application is $150 an hour. Reviewing the services of these attorneys and comparable hourly rates for such services, and even considering that Brown, Rudnick had more junior attorney hours involved than committee counsel, the court is of the opinion that Brown, Rudnick in effect is not charging "what the market will bear" for services of this quality. I see no appreciable difference between the quality of services between the two firms involved and therefore decline to reduce the Brown, Rudnick firm's compensation for any periods of "no further risk" inasmuch as I believe that any discrepancy in that regard in this case is overweighed by the fact that the lodestar figure for Brown, Rudnick could reasonably be allowed at a higher hourly rate figure to be equitable.

The foregoing constitutes the court's findings of fact and conclusions of law with regard to the fees in question.

### APPENDIX A

### UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW HAMPSHIRE

In re STRANWAY CORPORATION and Elmendorf Board Corporation, Debtors.

David J. FERRARI, Trustee of the Estates of Stranway Corporation and Elmendorf Board Corporation, Plaintiff,

v.

The FIRST NATIONAL BANK OF BOSTON; The United States of America; Aetna Life Insurance Company; The Aetna Casualty and Surety Company; The Prudential Insurance Company of America; Toronto Dominion Investments, Inc.; and Masonite Corporation, Defendants.

Chapter 11

Nos. 84–068, 84–069 (Jointly Administered)

### COMPLAINT TO DISALLOW OR SUBORDINATE CLAIMS

To the Honorable James E. Yacos, Bankruptcy Judge:

David J. Ferrari, the duly appointed trustee in these jointly administered Chapter 11 cases (the "Trustee") respectfully represents:

*Parties and Jurisdiction*

1. The Trustee was appointed on or about June 13, 1984, qualified, and has been serving as trustee in these cases since that date.

2. The First National Bank of Boston ("FNBB") is a national banking association with principal offices at 100 Federal Street, Boston, Massachusetts.

3. The United States of America is a party as a result of the involvement of the Farmers Home Administration, an agency of the United States Department of Agriculture ("FmHA").

4. Aetna Life Insurance Company ("Aetna Life") and The Aetna Casualty and Surety Company ("Aetna Casualty") are affiliated domestic insurance companies with offices at 151 Farmington Avenue, Hartford, Connecticut. (Aetna Life and Aetna Casualty are sometimes referred to collectively as "Aetna").

5. The Prudential Insurance Company of America ("Prudential") is a domestic insurance company with offices at Prudential Center, Boston, Massachusetts.

6. Toronto Dominion Investments, Inc. ("Toronto") is a Delaware corporation with offices at Suite 3148, One First National Place, Chicago, Illinois.

7. Masonite Corporation ("Masonite") is a Delaware corporation with offices at 29 North Market Drive, Chicago, Illinois.

8. Jurisdiction is based on 28 U.S.C. § 1334(b) in that this civil proceeding seeking disallowance or subordination of claims arises under 11 U.S.C. §§ 502 and 510, respectively, and arises in or is related to these jointly administered title 11 cases. This proceeding is a "core proceeding" within the meaning

of 28 U.S.C. § 157(b) in that it involves determinations concerning the validity, extent, or priority of liens; and the disposition of claims against, and counterclaims by, the estate.

## COUNT I

9. Elmendorf Board Corporation ("Elmendorf") was organized under Delaware law in 1976 primarily for the purpose of constructing and operating a manufacturing facility in New England for the production of oriented strand board ("OSB").

10. OSB is a structural panel made from wood flakes organized into layers in which the flakes in adjoining layers are oriented in opposite directions. The layers of wood flakes are coated with resin and formed under high pressure into four foot sheets of varying lengths and thicknesses. OSB is made from low grade timber and is designed to have the structural qualities of plywood at lower cost.

11. Elmendorf is, and at all times relevant hereto has been, wholly owned by Stranway Corporation ("Stranway"), a Delaware corporation, which has no significant assets other than its interest in Elmendorf.

12. After years of planning and preparation, Elmendorf, Stranway and numerous other parties, including the defendants, entered into several agreements in July, 1979, to provide for the construction and financing of an OSB plant to be owned and operated by Elmendorf in Claremont, New Hampshire (the "Plant"). The parties' arrangements for construction and finance of the Plant and the capitalization of Stranway and Elmendorf were embodied in a Multi-Party Agreement dated July 17, 1979 (the Multi-Party Agreement").

13. Elmendorf contracted with Bison-North America, Inc. ("Bison-NA"), an Oregon corporation, and its affiliates Inter-Bison Sales Baehre & Greten GmbH & Co. KG ("Inter-Bison") and Bison-Werke Baehre & Greten GmbH & Co., K.G. ("Bison-Werke"), both limited partnerships organized under the laws of the Federal Republic of Germany, who undertook to construct and equip the Plant. (Bison-NA, Inter-Bison and Bison-Werke are sometimes referred to collectively as "Bison Affiliates.")

14. The agreements between the Bison Affiliates and Elmendorf, by their terms, provided that the Bison Affiliates would "construct, furnish and deliver a complete Bison Multiple-Opening Caul Oriented-Strand Board Manufacturing Plant for Elmendorf on a turnkey basis at a job site in Claremont, New Hampshire." In that connection, the Bison Affiliates were "(i) to design, develop and construct production, warehousing and related buildings, including site work and other improvements and utility hookups to be located at the Job Site; (ii) to design, deliver and install equipment, related utility services and other related items; and (iii) to develop the manufacturing processes to put the Plant in operation."

15. The Plant was intended to be the first manufacturing facility constructed in North America for the production of OSB and to utilize processes developed by the Bison Affiliates.

16. To arrange the financing necessary for such a project, Stranway in 1978 retained the investment banking firm of Moors & Cabot Associates, Inc. ("Moors & Cabot").

17. A complex plan to finance the project, involving both debt and equity investment, was devised by Stranway, Elmendorf, Aetna, Prudential, Toronto, FNBB and Moors and Cabot, and later was embodied in the Multi-Party Agreement.

18. The financing was to take place in two phases: the construction phase and the post-construction phase.

19. In the construction phase construction of the plant was to be funded by the

sale to institutional investors, including Aetna, Prudential and Toronto, of capital stock in Stranway, representing, after issuance, one hundred (100%) percent of all outstanding preferred and seventy (70%) percent of all outstanding common shares, for an aggregate price of $6,125,000, and by a $22,500,000 construction loan to be provided by Swiss Bank Corporation, Atlanta Agency ("Swiss Bank").

20. In the post-construction phase the construction loan was to be paid off by the sale by Elmendorf of its fifteen-year notes, in the aggregate amount of $24,700,000, for an aggregate price of $24,700,000.

21. These notes were to be secured by a first lien on the Plant and guaranteed to the extent of ninety (90%) percent by FmHA.

22. It was contemplated that the notes would be purchased initially by FNBB who would, in turn, immediately sell, for an aggregate price of $22,230,000, direct interests or participations totalling ninety (90%) percent, to the institutional investors who had purchased stock in Stranway.

23. Under or in connection with the Multi-Party Agreement, Swiss Bank agreed to provide the 22,500,000 construction loan, FNBB to purchase the fifteen-year notes totalling $24,700,000 on completion of construction, and FmHA, with respect to such notes, to issue its ninety (90%) percent guarantee.

24. Aetna, Prudential and Toronto (collectively, the "Investors") committed pursuant to the Multi-Party Agreement to purchase *only eighty-five (85%) percent* of the available stock in Stranway and the corresponding interests or participations in the Elmendorf notes.

25. In effect, this meant that fifteen (15%) percent of the necessary financing would have to be placed with another investor or other investors.

26. Accordingly, at the closing of the initial phase of the financing on July 17 and 18, 1979 (the "Equity Closing"), the Investors purchased stock in Stranway, as follows:

| Investor | Stock Purchased | Purchase Price |
|---|---|---|
| Aetna Casualty | 97,250 Preferred | $3,403,750 |
| | 97,250 Class A Common | |
| Prudential | 38,900 Preferred | $1,361,500 |
| | 38,900 Class B Common | |
| Toronto | 11,511 Preferred | $ 402,885 |
| | 11,511 Class A Common | |
| | TOTAL: | $5,168,135 |

27. The balance of 29,339 preferred and 29,339 Class A common shares were purchased at the Equity Closing for $956,865 by Moors & Cabot Associates, II, Inc. ("Moors & Cabot II"), an affiliate of Moors & Cabot, with a view toward selling such shares to other institutional investors satisfactory to each of the Investors. The purchase price paid by Moors & Cabot II was financed by a loan from Inter-Bison, and the shares acquired by Moors & Cabot II were pledged to secure such loan.

28. The Investors also agreed at the Equity Closing to purchase their proportionate interests in the fifteen-year notes from FNBB, immediately following the purchase thereof by FNBB from Elmendorf.

29. There were to be a total of six notes: five (5) notes guaranteed by FmHA totalling $22,230,000 (the "Guaranteed Notes"), and one unguaranteed note in the amount of $2,470,000 (the "Unguaranteed Note").

30. More specifically, the Investors agreed to purchase from FNBB three (3) of the Guaranteed Notes, as follows:

| Purchaser | Amount of Guaranteed Note to be Purchased |
|---|---|
| Aetna Life | $11,115,000 |
| Prudential | $ 4,446,000 |
| Toronto | $ 1,316,016 |

31. A fourth Guaranteed Note in the amount of $3,129,984 was to be held by FNBB, subject to the right of Moors & Cabot II, or its qualified designee, for a period of three years, to acquire such note for the full unpaid principal amount.

32. Under FmHA regulations FNBB was to retain the fifth Guaranteed Note in the amount of $2,223,000.

33. As to the Unguaranteed Note, the Investors agreed to purchase from FNBB participations, as follows:

| Purchaser | Participations to be Purchased in Unguaranteed Notes |
|---|---|
| Aetna Life | $1,235,000 |
| Prudential | $ 494,000 |
| Toronto | $ 146,224 |

34. Moors & Cabot II agreed to purchase a $307,776 participation in the Unguaranteed Note for resale to a qualified investor.

35. The remaining (10%) of the Unguaranteed Note was to be retained by FNBB, as required by FmHA regulations.

36. Immediately following the Equity Closing, construction of the Plant commenced.

37. The project was underfinanced from the beginning, however.

38. All of the financing contemplated by the investment plan was not placed with qualified investors at the time of the Equity Closing. This not only reduced the number of investors, but increased the magnitude of any additional investment which might be required of each investor.

39. Eventually, Masonite purchased the shares of preferred and common stock acquired by Moors & Cabot II at the Equity Closing, and agreed to purchase the corresponding participation in the Unguaranteed Note. Masonite was unwilling, however, to purchase the corresponding Guaranteed Note.

40. Moreover, substantially all of the proceeds from the Equity Closing (which were contributed by Stranway to the capital of Elmendorf), and the construction loan proceeds were required to fund construction.

41. Inadequate provision was made, therefore, for working capital requirements, and, more important, for meeting the inevitable contingencies that attend almost every construction project, particularly one involving the construction of a unique facility.

42. In fact, cash flow projections made at the time of the Equity Closing revealed that Elmendorf would face significant cash flow problems in the months immediately prior to completion of the Plant.

43. Construction proceeded during the next two and one-half years after the Equity Closing.

44. During the construction period several problems jeopardizing the project developed.

45. The nature of these problems was foreseeable at the time of the Equity Closing, and was well known to the Investors at the time of the sale of the Guaranteed and Unguaranteed Notes on or about November 13, 1981 (the "Debt Closing").

46. In fact, certain of the problems were documented in a report prepared for FmHA by FNBB just prior to the Debt Closing, as follows:

a. Housing starts had gone from $2,021,000 nationally in 1978 to $1,292,000 in 1980. Housing starts for 1981 were projected (as of November, 1981) to fall to $1,100,000. Virtually no growth was projected for the period 1981–1990. This information was significant to Elmendorf because the housing industry is a primary user of OSB.

b. Data Resources, Inc. projected that combined U.S. and Canadian OSB and waferboard (a product similar to OSB) plant capacity would increase from 847 million square feet in 1981 to 1,570 million square feet in 1983, with plant capacity always substantially outpacing projected demand.

c. Estimated mill net revenues per 1000 square feet of OSB had declined from $234 as of November, 1978, to $187 as of November, 1981.

d. Elmendorf's production costs per 1000 square feet of OSB (including existing debt service) had risen from

$171 projected in November, 1978 to $218 as of November, 1981.

e. Estimated cash revenues at full Plant capacity as of November, 1981 would be *less* than cash costs by $3,219,000 on annual sales of $13,351,-000. This reflected a difference from November, 1978 projections of $8,011,-000 annually.

f. The Plant was not mechanically complete. Significantly, the log loading end was incorrectly designed and corrections to that system would not be completed for several months.

g. Elmendorf was in default under its construction loan in that, among other things, it had failed to make required interest payments.

47. In fact, the outlook was even bleaker, because the Plant suffered from other serious design flaws and inadequacies, including insufficient dryer capacity which reduced production capacity by approximately one-half during the winter months. The Investors knew of these flaws at the time of the Debt Closing.

48. The Investors had advanced $2,000,-000 to Elmendorf during the construction period as unsecured loans, to meet certain operating expenses.

49. At the time of the Debt Closing, FNBB concluded that a substantial infusion of working capital would be required to fund start-up and market losses and to afford Elmendorf any chance of gaining economic viability. (The Debt Closing proceeds were required to pay off the construction loan, and could not be used for working capital purposes.)

50. The prospect of Elmendorf's receiving approximately $6,500,000 from a proposed safe harbor tax lease transaction (in which certain tax attributes relating to the new machinery and equipment at the Plant were to be conveyed to General Electric Company ("GEC")), commitments from the Investors to provide an additional $2,000,000 in working capital, and the conviction that "there is no reason to believe that the insurance companies would not provide more capital if subsequently needed" led FNBB to the tentative conclusion on November 10, 1981 that these sources of working capital "could provide sufficient impetus for this project to become viable."

51. Even assuming such an infusion of working capital, FNBB advised FmHA that "the ultimate viability of the project will be determined to a large degree by the extent to which the housing industry recovers from its present economic slump." Ironically, of course, the projections cited by FNBB contained no suggestion that the housing industry would so recover.

52. Elmendorf was insolvent on an actual balance sheet test at the time of the Debt Closing, was in default on its Swiss Bank loan, and had no ability to meet its current operating expenses.

53. Under the Multi-Party Agreement and a certain Note Agreement executed in conjunction therewith, the Investors' obligation to purchase the Guaranteed Notes and participations in the Unguaranteed Note was contingent, among other things, on satisfaction of the following conditions:

a) The receipt of an accountant's letter of the type described in the Multi-Party Agreement.

b) Completion of construction of the Plant as evidenced by the following:

(i) A certificate from the Bison Affiliates that the Plant had been constructed in accordance with its plans and specifications.

(ii) A certificate of occupancy.

(iii) A certificate of an independent testing organization that the Plant had passed certain performance tests.

c) Existence of no material defaults under the Swiss Bank construction loan agreement.

54. FmHA's commitment to guarantee the Guaranteed Notes was also contingent on completion of the Plant and satisfaction of these performance tests.

55. At the time of the Debt Closing, none of the conditions specified in Paragraph 53 hereof had been met. Construction of the Plant had not been completed and the Bison Affiliates could not furnish the certificates they were required to supply.

56. The Plant could not meet the performance tests unless substantial repairs and redesign of the "green end" of the Plant were done. In addition to the problems with the "green-end," the Plant suffered from several other serious engineering, design, supply, installation and construction defects of which the Investors and FNBB were aware at the time of the Debt Closing.

57. The Investors, FNBB and FmHA expressly waived each and every one of the specified conditions which had not been met.

58. Rather than face the immediate loss of their $6,125,000 equity investment and $2,000,000 in unsecured loans, a foreclosure on the Plant by Swiss Bank, and possible litigation with Swiss Bank over their commitments, in conjunction with FNBB and FmHA, to provide permanent financing, the Investors went forward with the Debt Closing and purchased their proportionate share of the Guaranteed Notes and participations in the Unguaranteed Note, notwithstanding that construction of the Plant had not been completed, the performance tests could not be met, and Elmendorf's precarious financial condition.

59. To provide the working capital necessary to induce FmHA to issue its ninety (90%) percent loan guarantee, the Investors agreed, subject to certain limitations, to guarantee to GEC the benefits of the proposed safe harbor tax lease.

60. In lieu of their commitments to provide additional working capital directly, the Investors caused Elmendorf to obtain a commitment for a $4,000,000 line of credit from Swiss Bank, which Bison-Werke agreed to guarantee.

61. FNBB and FmHA consented to the tax lease, and the tax lease transaction and the sale of the Guaranteed and Unguaranteed Notes were closed.

62. In that connection, the Investors purchased from FNBB three of the Guaranteed Notes, as follows:

| Purchaser | Amount of Guaranteed Note (and Purchase Price Therefor) |
|---|---|
| Aetna Life | $11,115,000 |
| Prudential | $ 4,446,000 |
| Toronto | $ 1,316,016 |

63. The other two Guaranteed Notes in the amounts of $3,129,984 and $2,223,000, respectively, were retained by FNBB. Ultimately, FNBB assigned the $3,129,984 note to Caterpillar Pension Fund at a substantial discount. FNBB continued to retain the $2,223,000 note, however.

64. Participations in the Unguaranteed Note were also purchased from FNBB, as follows:

| Purchaser | Amount of Participation (and Purchase Price Therefor) |
|---|---|
| Aetna Life | $ 1,235,000 |
| Prudential | $ 494,000 |
| Toronto | $ 146,224 |
| Masonite | $ 347,776 |

65. The remaining ten (10%) of the Unguaranteed Note was retained by FNBB, as required by FmHA regulations.

66. Substantially all of the Debt Closing proceeds were used to pay off the $22,500,000 construction loan from Swiss Bank, including accrued interest.

67. The $6,500,000 proceeds from the tax lease transaction were only made available in part for working capital purposes. The Investors caused $2,000,000 thereof to be paid to themselves in repayment of the $2,000,000 unsecured loans made prior to the Debt Closing.

68. In addition, the Investors permitted approximately $1,500,000 to be paid to Bison-NA in prepayment of certain notes related to construction, despite serious defects in the Plant.

69. Moreover, the Swiss Bank line of credit commitment and related Bison-Werke guarantee were illusory, be-

cause the Investors did not negotiate sufficiently firm commitments from Swiss Bank and Bison-Werke when they had the opportunity to do so (prior to paying off the construction loan).

70. As a result, Swiss Bank provided only approximately one-half of the anticipated $4,000,000 line of credit.

71. As a consequence of the transactions which took place at the time of the Debt Closing, therefore, the Investors improved their positions but left Elmendorf in an economically hopeless position.

72. By taking such steps as were required to induce FNBB and FmHA to close the sale of the Guaranteed and Unguaranteed Notes, the Investors averted a foreclosure by Swiss Bank which would have wiped out not only their equity investment, but their unsecured loans made during the construction period. They also averted litigation by Swiss Bank concerning their commitment to purchase the Guaranteed Notes and participations in the Unguaranteed Note. The effect to the Investors was to convert their potential liability to Swiss Bank into an obligation which was 90% guaranteed by the FmHA and secured by a first lien on the Plant.

73. Shortly after the Debt Closing, the Investors caused their $2,000,000 in pre-Debt Closing unsecured loans to be repaid.

74. To the extent the Investors purchased participations in the Unguaranteed Note at the Debt Closing, they, in effect, converted their unsecured loans to secured loans.

75. While the Investors undertook certain contingent liability by providing their limited guarantee to GEC with respect to the tax lease, they did so with the expectation that such guarantee would only be called in the event of a sale by Elmendorf to an unqualified transferee or a transferee not consenting to the tax lease, which circumstances, by virtue of their controlling interest in Elmendorf, the Investors believed they could reasonably prevent.

76. At the time of the Debt Closing, Elmendorf had no realistic prospect of being able to repay the Guaranteed and Unguaranteed Notes.

77. In fact, only four months after the Debt Closing, the Investors and Elmendorf requested that the FmHA grant a two (2) year moratorium on principal and interest payments. The Investors also requested that FmHA guarantee the repayment not only of ninety (90%) percent of the deferred interest, but of interest on that portion of the deferred interest.

78. Problems with the Plant persisted; market conditions did not improve; and Elmendorf lost $4,100,000 in 1982 and $5,500,000 in 1983.

79. Various reorganization strategies were discussed during 1982 and 1983 among the Investors, Masonite, FNBB and FmHA. Over time, these discussions tended to exclude non-Investor management representatives.

80. During this time, the Investors, Masonite and even FNBB acquired additional equity interests in Stranway.

81. In 1983, the Investors advanced approximately $1,000,000 to Elmendorf, when it required several times that amount for working capital. This advance was made almost as an exit payment in the sense that Investor representatives then resigned from management and attempted to extricate themselves from the affairs of Elmendorf.

82. FmHA purchased the Guaranteed Notes later in 1983, for the full unpaid principal balance and accrued interest, apparently in an effort to limit its ongoing obligation with respect to deferred interest.

83. FNBB is FmHA's agent with respect to the Guaranteed Notes, and continues to hold the Unguaranteed Note as to which participations totalling ninety (90%) percent continue to be held by the Investors and Masonite.

84. Involuntary petitions under Chapter 7 were filed against Stranway and Elmendorf on February 22, 1984 and an order for relief under Chapter 11 was entered as to both on March 22, 1984.

85. At all times relevant since the Equity Closing, the Investors, by virtue of their controlling equity interest in Stranway, and direct participation in management through the companies' boards of directors, have controlled Elmendorf and Stranway.

86. Masonite and even FNBB are "insiders" within the meaning of Bankruptcy Code § 101(25) by virtue of their equity interests in Stranway and their interests in the notes purchased at the Debt Closing which was the central element of the financing of Elmendorf.

87. As insiders, the Investors, Masonite and FNBB had a fiduciary duty to Elmendorf and Stranway. They breached that duty through their inequitable conduct in connection with the Debt and Equity Closings in which they placed their own interests ahead of those of Elmendorf, Stranway, and their creditors.

88. At all relevant times, the Investors, Masonite, FNBB and FmHA had knowledge of the chronic undercapitalization and construction difficulties which plagued Elmendorf, and of the circumstances described herein surrounding the Equity and Debt Closings.

89. If the claims arising under the Guaranteed Notes (now held by FmHA) and the Unguaranteed Note (held by FNBB for the benefit of the Investors, Masonite, and itself) are treated as secured in these cases, there is no equity left in the estate for unsecured creditors.

90. The Plant, which is the only significant asset in these cases, has a value of up to $2,500,000 if sold as an operating manufacturing facility.

91. The total indebtedness under the Guaranteed and Unguaranteed Notes is approximately $30,000,000.

92. Other priority and general unsecured claims amount to approximately $4,600,000, including certain disputed claims.

93. Even if the claims arising under the Guaranteed and Unguaranteed Notes were to be allowed only as unsecured claims entitled to the same priority as other general unsecured claims, the dividend available to such other creditors would be reduced eight fold, from approximately fifty-five (55%) percent to seven (7%) percent (assuming a sale of the Plant for $2,500,000, and allowance of all disputed claims).

94. Subordination of the claims arising under the Guaranteed and Unguaranteed Notes to other general unsecured claims is mandated under 11 U.S.C. § 510 in that, among other things, the claims arose out of investments made principally by insiders who knew, or reasonably should have known, that Elmendorf was chronically undercapitalized and who made such loans in a manner designed to protect the insiders' downside risk at the expense of other creditors and shareholders.

## COUNT II

95. Plaintiff adopts by reference preceding paragraphs 1 to 94, inclusive.

96. Disallowance of Defendants' claims under 11 U.S.C. § 502 is required in that, among other things, the claims should be treated as equity capital provided principally by insiders at a time when there was no reasonable expectation that the funds, if viewed as loans, would be repaid.

## COUNT III

97. Plaintiff adopts by reference preceding paragraphs 1 to 96, inclusive.

98. The acts of the Defendants alleged herein constitute breaches of Defendants' fiduciary obligations to Stranway, Elmendorf and their creditors.

WHEREFORE, the Trustee prays that the Court enter an order:

1. As to Count I, subordinating all claims of the Defendants to all other claims in these cases;
2. As to Count II, disallowing all claims of the Defendants;
3. As to Count III, granting judgment to the Trustee against the Defendants for damages; and
4. Granting to the Trustee such other relief as may appropriate and just, including, without limitation, ordering that any lien, or portion thereof, securing a subordinated or disallowed claim, be transferred to the Trustee for the benefit of the estates.