**SHAMBLIN'S READY MIX, INC., a West Virginia corporation, Plaintiff–Appellee,**

v.

**EATON CORPORATION, an Ohio corporation; RSH, Inc., d/b/a Scott Equipment Company, Defendants–Appellants.**

No. 88–1101.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 12, 1989.

Decided May 1, 1989.

---

Kathleen Bertha Burke (Paul D. Koethe, Jones, Day, Reavis & Pogue, John H. Tinney, David B. Thomas, Spilman, Thomas, Battle & Klostermeyer, on brief), for defendants-appellants.

Arden John Curry, II (Arden J. Curry, Pauley, Curry, Sturgeon & Vanderford, on brief), for plaintiff-appellee.

Before RUSSELL, Circuit Judge, BUTZNER, Senior Circuit Judge, and HENDERSON, United States District Judge for the District of South Carolina, sitting by designation.

BUTZNER, Senior Circuit Judge:

This conversion case is before us for the second time. In the first appeal we affirmed the district court's judgment of $3,531 in compensatory damages but set aside the jury's award of $600,000 in punitive damages because it was tainted by the plaintiff's improper and highly prejudicial closing argument. We remanded for a new trial on the amount of punitive damages. *Shamblin's Ready Mix, Inc. v. Eaton Corp.*, 819 F.2d 1139 (4th Cir.1987) (unpublished). On remand the jury awarded the plaintiff $650,000 in punitive damages.

Because we find that the plaintiff based its closing argument on inadmissible evidence and that the jury's punitive damages award was excessive, we set aside the verdict and reduce the award of punitive damages to $60,000.

I

In our previous opinion we held that the following facts justified an award of punitive damages. In 1984 the plaintiff,

Shamblin's Ready Mix, Inc., a West Virginia company, purchased a motor and pump for its paddle wheel boat from Eaton Corporation, an Ohio company, through Eaton's local distributor, Scott Equipment Company, an Ohio company. Shortly after the sale, the equipment failed to work properly. Scott made an immediate offer to pick up the Eaton equipment and take it to Scott's facility in Ohio for free repair. Shamblin, however, refused the offer of repair and demanded new units. Scott then withdrew its offer, effectively forcing Shamblin to rely on Eaton's warranty.

Shamblin brought the Eaton equipment back to Scott for consideration under Eaton's warranty. On October 2, 1984, Shamblin's attorney wrote a letter to Scott demanding new equipment rather than repair under a warranty and threatening a lawsuit if the demand was not met. Also on October 2, 1984, Scott informed Shamblin by letter that there was contamination in the units that was unrelated to materials or workmanship, so that the warranty did not cover the cost of repair. Scott then shipped the equipment to Eaton for further warranty consideration, without Shamblin's knowledge or consent.

After Shamblin received Scott's letter denying warranty coverage, Shamblin telephoned Scott several times to demand return of the equipment in its unrepaired condition. By this time, of course, Scott was unable to return the equipment because it had already forwarded it to Eaton. On October 15, 1984, Scott sent Shamblin a letter stating that Eaton's analysis of the equipment confirmed that the problems were the result of contamination and that the warranty did not apply. Scott further informed Shamblin in this letter that Eaton could repair the units and return them with a new warranty at a cost of $2,069.

On December 17, 1984, Shamblin again requested Scott to return its equipment. On the same day Scott sent a letter to Shamblin advising it that Eaton refused to return the equipment because of Shamblin's threat of a lawsuit and that Eaton would return the equipment if Shamblin authorized repairs at a cost of $2,069. On December 20, 1984, Shamblin wrote to Scott demanding that the unrepaired equipment be returned within five days. Scott replied on December 21, 1984, reaffirming Eaton's previous position and telling Shamblin that it was strictly a corporate decision by Eaton over which Scott had no control. The letter further advised Shamblin that "Eaton Corporation would be glad to discuss this matter with you at your convenience."

Shamblin did not contact Eaton. Instead, on January 8, 1985, Shamblin filed this suit against Scott and Eaton for conversion. On January 30, 1985, before answering Shamblin's complaint, Eaton wrote to Shamblin and offered unconditionally to return the pump and motor. Shamblin refused the offer.

## II

Eaton and Scott contend that the district court abused its discretion in refusing to set aside the jury's punitive damages award of $650,000.

In a diversity case, state substantive law determines the circumstances justifying punitive damages. Federal law governs review of the size of jury verdicts by trial and appellate courts. *Donovan v. Penn Shipping Co.,* 429 U.S. 648, 649, 97 S.Ct. 835, 836–37, 51 L.Ed.2d 112 (1977). Under West Virginia law, the assessment of punitive damages requires consideration of "all the circumstances surrounding the particular occurrence including the nature of the wrongdoing, the extent of harm inflicted, the intent of the party committing the act, the wealth of the perpetrator, as well as any mitigating circumstances." *Wells v. Smith,* 297 S.E.2d 872, 878 (W. Va.1982). In West Virginia, as in many other states, punitive damages may be awarded for wanton, reckless, malicious, or oppressive conduct. *Wells,* 297 S.E.2d at 876–77. In our previous opinion we held that the evidence viewed in the light most favorable to Shamblin satisfied West Virginia's criteria for an award of punitive damages. *Cf. Cook v. Heck's, Inc.,* 342 S.E.2d 453, 455 (W.Va.1986). The evidence intro-

duced on retrial provides no reason for changing this assessment of liability.

A reviewing court should set aside an excessive verdict if it "is of the opinion that the verdict is against the clear weight of the evidence, or is based on evidence which is false, or will result in a miscarriage of justice." *Johnson v. Parrish,* 827 F.2d 988, 991 (4th Cir.1987). A district court has broad discretion to decide whether to set aside a verdict claimed to be excessive, and its ruling may be disturbed "only in the most exceptional circumstances." *Johnson,* 827 F.2d at 991.

■ In this case exceptional circumstances dictate that the verdict be set aside. The verdict is based upon false, misleading, and prejudicial evidence. Bill Jarvis, a former Scott employee, testified over objection at the second trial that Eaton had a "policy" of withholding equipment returned to it for warranty consideration unless Eaton could be paid for repairing it. Shamblin's counsel did not lay any foundation to establish that Jarvis had knowledge of Eaton's policies, and cross-examination disclosed that Jarvis in fact had no such personal knowledge. Eaton's product support manager later testified that he alone made the decision to retain Shamblin's equipment because of the threat of litigation and that there had never been another such incident. The district court erred in allowing Jarvis to testify to something about which he had no personal knowledge. *See* Fed.R.Evid. 602. The prejudice to Eaton and Scott from this unfounded testimony was compounded when Shamblin's counsel based a large part of his closing argument on Jarvis's testimony. Shamblin's counsel exhorted the jury to render a large punitive damage award so that Eaton would be forced to change its "policy":

> What's scary about this case is not once did anyone get up here and tell you we've changed our corporate policies; not once did they tell you they have done something to stop this; and not once, and most importantly, did they tell you that it wouldn't happen again. I submit to you it will happen again and again, unless you give them a message. You have a

unique opportunity in ruling on a punitive damage case to change their policy because if you give an award that gets their attention, that gets their corporate board's attention, you can change their policy. This may be the only opportunity that you're ever going to have to do that to a large company.

> \* \* \* \* \* \*

> [I]f your verdict is not large enough ... what these people are going to do is they are going to laugh, they are going to say juries in West Virginia are going to condone our type of business practice, and they are going to continue to do it again and again and again until someone can stop it.

The prejudicial effect of Jarvis's testimony and Shamblin's improper argument is most forcefully manifested in the jury's punitive damages award, which exceeded the compensatory damages by a ratio of over 184 to 1.

Considering the extent of the harm inflicted by Eaton and Scott, the intent of Eaton's employee, and Eaton's belated offer to return the equipment, we conclude that the punitive damages award is so grossly inflated as to be a miscarriage of justice. *See Johnson,* 827 F.2d at 991. Shamblin sustained no personal injuries or property damage as a result of Eaton's and Scott's conversion. Shamblin also suffered no actual harm from the conversion since it was deprived of the equipment during winter months when it never used its boat. Although Eaton's employee willfully retained the equipment until this action was filed, he did so because he apparently believed it was necessary to preserve the equipment as evidence in the event Shamblin carried out its precipitate threats of litigation.

We conclude that the jury's punitive damages award was grossly excessive, the product of erroneously admitted evidence and misleading argument. It must be set aside to prevent injustice.

### III

■ Eaton and Scott urge us to determine the amount of punitive damages rath-

er than remand for yet a third trial. Shamblin opposes this on the grounds that denying it a third jury trial would violate the seventh amendment and Fed.R.Civ.P. 38.[1]

The seventh amendment provides:

"In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law."

To determine whether the seventh amendment is applicable, our task is to examine the nature of an action seeking punitive damages and the remedy sought. *See Tull v. United States*, 481 U.S. 412, 417–18, 107 S.Ct. 1831, 1835–36, 95 L.Ed.2d 365 (1987).

### IV

An English court first referred to exemplary damages in Huckle v. Money, 95 Eng. Rep. 768 (K.B.1763). *See* K. Redden, *Punitive Damages* § 2.2(A)(2) (1980); Sullivan, Punitive Damages in the Law of Contract: The Reality and Illusion of Legal Change, 61 Minn.L.Rev. 207, 213 (1977). Money, a messenger of the King, took Huckle, a journeyman printer, into custody and held him for six hours on authority of a general warrant issued by the secretary of state which directed the apprehension of the printers of an objectionable publication. The court told the jury that "they were not bound to any certain damages." Although the actual harm to Huckle was slight, the jury awarded 300 pounds for assault and imprisonment. The defendant challenged it as excessive, but the court refused to set it aside. The Lord Chief Justice found that the egregious conduct of the King's messenger violated the Magna Charta and justified "exemplary" damages.

Punitive damages were also allowed in the United States at the end of the 18th century. *See* K. Redden, *supra,* § 2.3(B) (citing *Coryell v. Colbough,* 1 N.J. (Coxe) 77 (1791)); *see also Day v. Woodworth,* 54 U.S. (13 How.) 363, 371, 14 L.Ed. 181 (1851) (dictum).

These cases illustrate that a cause of action for an aggravated tort justifying punitive or exemplary damages was tried in a court of law. Consequently, there can be no doubt that the seventh amendment guarantees a jury trial on the issue of the defendant's liability for punitive damages. *See Tull,* 481 U.S. at 422–25, 107 S.Ct. at 1838–40; *Pernell v. Southall Realty,* 416 U.S. 363, 375, 94 S.Ct. 1723, 1729–30, 40 L.Ed.2d 198 (1974).

### V

The next issue is whether the seventh amendment requires that the amount of punitive damages be determined by a jury. More specifically in the context of this appeal, the issue is whether the seventh amendment precludes a court from reducing the amount of punitive damages awarded by a jury without remanding for a new trial.

Courts of appeals in the First, Sixth, Seventh, and Eighth Circuits have reduced the amount of punitive damages without remanding for a new trial. In three of these cases, juries had awarded excessive punitive damages. *See Rowlett v. Anheuser–Busch, Inc.,* 832 F.2d 194, 207 (1st Cir. 1987) (verdict for $3,000,000 reduced to $300,000); *Bell v. City of Milwaukee,* 746 F.2d 1205, 1267, 1279 (7th Cir.1984) (verdict for $350,000 reduced to $50,000);[2] *Guzman v. Western State Bank,* 540 F.2d 948, 954 (8th Cir.1976) (verdict for $25,000 reduced to $10,000). In the fourth case, the appellate court reduced a judgment for pu-

---

**1.** Rule 38 entitles a party to a jury trial on demand "as declared by the Seventh Amendment." The Rule neither enlarges nor diminishes the right secured by the Constitution. *See* 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2301 (1971).

**2.** In a subsequent case the Seventh Circuit, without mentioning *Bell,* held that the seventh

amendment did not permit a district court to reduce a jury verdict for punitive damages. *See McKinnon v. City of Berwyn,* 750 F.2d 1383, 1391–92 (7th Cir.1984). We decline to follow *McKinnon.* It was decided before *Tull v. United States,* 481 U.S. 412, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987), which we deem to be contrary to *McKinnon.*

nitive damages entered by a district court after a bench trial. *See Shimman v. Frank*, 625 F.2d 80, 102, 104 (6th Cir.1980) (judgment for $75,000 reduced to $20,000). Although the appellate courts in three cases reduced awards made by a jury, none of the opinions discusses the seventh amendment.

In *Kennon v. Gilmer*, 131 U.S. 22, 28–30, 9 S.Ct. 696, 698–99, 33 L.Ed. 110 (1889), the Supreme Court held that the seventh amendment precludes a court from setting aside a jury verdict for compensatory damages and substituting its own estimate of damages, but the Court had no occasion to address the question of punitive damages. The marked difference between compensatory and punitive damages persuades us that *Kennon v. Gilmer* does not control the outcome of the case before us. The purpose of compensatory damages is to make the plaintiff whole by vindicating a private wrong. Assessing the extent of harm is appropriately within the province of the jury in its capacity of fact finder. In contrast, punitive damages serve a public purpose. Punitive damages "are not compensation for an injury. Instead they are private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350, 94 S.Ct. 2997, 3012, 41 L.Ed.2d 789 (1974); *accord Leach v. Biscayne Oil & Gas Co.*, 169 W. Va. 624, 627–28, 289 S.E.2d 197, 199 (1982).[3]

In *Tull*, 481 U.S. 412, 107 S.Ct. 1831, the Supreme Court considered the question whether a plaintiff has a seventh amendment right to a jury's assessment of the civil penalties provided by the Clean Water Act. At the outset, the Court recognized that the "Seventh Amendment is silent on the question whether a jury must determine the remedy in a trial in which it must determine liability." 481 U.S. at 425–26, 107 S.Ct. at 1840. The Court explained:

> Nothing in the Amendment's language suggests that the right to a jury trial extends to the remedy phase of a civil trial. Instead the language "defines the kind of cases for which a jury trial is preserved, namely suits at common law." ... Although "[w]e have almost no direct evidence concerning the intention of the framers of the seventh amendment itself," the historical setting in which the Seventh Amendment was adopted highlighted a controversy that was generated ... by fear that the civil jury itself would be abolished." ... We have been presented with no evidence that the Framers meant to extend the right to a jury to the remedy phase of a civil trial.

481 U.S. at 426 n. 9, 107 S.Ct. at 1840 n. 9 (citations omitted). Although the Court held that the defendant was entitled to a jury on the issue of liability, it concluded that because determination of a remedy in a civil trial is not an essential function of a jury trial the seventh amendment did not require a jury trial for the determination of the civil penalty. 481 U.S. at 426–27, 107 S.Ct. at 1840–41.

We believe the Court's reasoning may be applied to punitive damages. The Court recognizes that punitive damages are similar to a civil penalty. *See Tull*, 481 U.S. at 422 n. 7, 107 S.Ct. at 1838 n. 7. *Tull* reiterated that the seventh amendment "was designed to preserve the basic institution of the jury trial in only its most fundamental elements." 481 U.S. at 426, 107 S.Ct. at 1840, quoting *Galloway v. United*

---

**3.** Many scholars contend that the modern rationale for punitive damages transforms them into a quasi-criminal sanction which should invoke the protections of the eighth amendment proscription against excessive fines and the fifth and fourteenth amendment guarantees of due process of law. *See, e.g.,* Jeffries, A Comment on the Constitutionality of Punitive Damages, 72 Va.L.Rev. 139 (1986). Other commentators have concluded that because punitive damages are more like criminal sanctions, judges should determine the amount after a jury has determined liability, just as a judge determines a sentence after a defendant has been convicted. *See, e.g.,* Note, The Imposition of Punishment by Civil Courts: A Reappraisal of Punitive Damages, 41 N.Y.U.L.Rev. 1159, 1171 (1966); Sales & Cole, Punitive Damages: A Relic that Has Outlived its Origins, 37 Vand.L.Rev. 1117, 1167–68 (1984). The Supreme Court has granted certiorari in *Browning–Ferris Industries v. Kelco Disposal, Inc.*, —— U.S. ——, 109 S.Ct. 527, 102 L.Ed.2d 559 (1988), to consider whether the award of punitive damages is limited by the eighth amendment.

*States,* 319 U.S. 372, 392, 63 S.Ct. 1077, 1088, 87 L.Ed. 1458 (1943). It is clear that the amount of exemplary damages is not a fundamental element of the trial. It is a remedy in the nature of a penalty designed to punish and deter reprehensible conduct.

The 18th century cases tried at common law do not require us to distinguish *Tull* or depart from its precedent that the seventh amendment does not extend to the remedy phase of a civil trial. In the 18th century, a defendant's reprehensible conduct was simply used in part to measure the plaintiff's recovery. Huckle v. Money, 95 Eng. Rep. 768 (K.B.1763), expressly describes the conduct giving rise to exemplary damages as a circumstance the jury may take into account when measuring the damages. The Lord Chief Justice explained this concept when giving the reasons why the court would not set aside the verdict:

> In all motions for new trials, it is as absolutely necessary for the court to enter into the nature of the cause, the evidence, facts, and circumstances of the case, as for a jury; the law has not laid down what shall be the measure of damages in actions of *tort;* the measure is vague and uncertain, depending upon a vast variety of causes, facts, and circumstances; *torts* or injuries which may be done by one man to another are infinite; in cases of criminal conversation, battery, imprisonment, slander, malicious prosecutions, etc. the state, degree, quality, trade or profession of the party injured, as well as of the person who did the injury, must be and generally are considered by a jury in giving damages; the few cases to be found in the books of new trials for *torts,* show that courts of justice have most commonly set their faces against them; and the courts interfering in these cases would be laying aside juries; before the time of granting new trials, there is no instance that the judges ever intermeddled with the damages.

*Huckle,* 95 Eng.Rep. at 768. Other English and American cases tried in the latter part of the 18th century and first part of the 19th century treated exemplary damages as a component of an appropriate measure of damages. *See generally* K. Redden, *supra* § 2.2.

The measure of damages in a cause of action for a tort is not a fundamental element of a trial. The proper measure is a function of law not of facts found by a jury. Many scholars have attributed the allowance of exemplary damages to the fact that in the 18th century common law pain and suffering, mental anguish, and other intangible harms were not permissible elements of compensatory damages. See, e.g., K. Redden, *supra,* § 2.2(B)–(C), at 28–29 (1980); Jeffries, A Comment on the Constitutionality of Punitive Damages, 72 Va.L.Rev. 139, 149–50 (1986); Note, The Imposition of Punishment by Civil Courts: A Reappraisal of Punitive Damages, 41 N.Y.U.L.Rev. 1158, 1160–61 (1966). If a plaintiff suffered little or no actual harm to person or property, as was the case in *Huckle,* he could still recover exemplary damages to compensate him for intangible harms. *See* K. Redden, *supra,* § 2.2(c); Sales & Cole, *supra* note 3, at 1121. Of course, the modern law of damages allows the plaintiff to be compensated for intangible harm. Thus, the compensatory function of punitive damages has become vestigial. *See Gertz,* 418 U.S. at 350, 94 S.Ct. at 3012; *see also* K. Redden, *supra,* § 7.5(D), § 2.3(A).

There is no principled distinction between civil penalties and the modern concept of punitive damages. Both serve the same purposes to deter and punish proscribed conduct. *Cf. Tull,* 481 U.S. at 422 n. 7, 107 S.Ct. at 1838 n. 7. Consistent with *Tull,* we hold that the seventh amendment does not require that the amount of punitive damages be assessed by a jury.

## VI

We conclude that remanding for yet a third trial would constitute an enormous waste of judicial as well as the parties' resources. At both trials, Shamblin's counsel made improper arguments which resulted in the jury rendering grossly inflated punitive verdicts. It is patently unfair that Eaton and Scott should be forced to under-

go yet another trial so that Shamblin may perfect its case. Since we determined in the first appeal that punitive damages are appropriate here, since two juries have awarded inappropriate windfalls to Shamblin at least in partial response to improper argument by Shamblin's counsel, and since we hold that a new trial is not constitutionally required, we deem it prudent to address the problem of the amount of punitive damages to be awarded, without remand, on the basis of the record and guidance afforded by other cases. *See Rowlett,* 832 F.2d at 207; *Bell,* 746 F.2d at 1267; and *Guzman,* 540 F.2d at 954.

Assessing punitive damages cannot be done with scientific exactitude. We believe that an award of $60,000 is appropriate given the absence of any personal injury or property damage arising out of Eaton and Scott's conversion. Through the intransigence of all parties, this simple contractual dispute about breach of warranty turned into a tortious dispute about which party could retain evidence pending threatened litigation unless the parties could agree on the price of repairs.

We are cognizant that a punitive damages award in order to be a deterrent must be "enough to smart." *Rowlett,* 832 F.2d at 207; *see also Leach,* 169 W. Va. at 628, 289 S.E.2d at 199. The conversion of Shamblin's equipment was not the result of any action by the defendants' directors or corporate officers. While $60,000 may be a minute percentage of Eaton's annual revenue, we believe it is sufficient to punish the company for its vicarious liability and to deter future misconduct by relatively low ranking employees.[4]

## VII

The district court properly submitted the question of liability for reprehensible conduct to the jury. The seventh amendment requires that this be done if the evidence is sufficient to sustain a verdict of liability. The seventh amendment, however, does not require a court to accept an excessive verdict that is manifestly unjust. Instead, the court can reduce the verdict and enter judgment for an appropriate amount of punitive damages to remedy the wrong committed by the defendant without requiring a new trial. *Cf. Tull,* 481 U.S. at 425–27, 107 S.Ct. at 1839–41. This procedure permits the court to take into account all of the circumstances justifying punishment and deterrence, including the prior awards of punitive damages, if any, against the defendant for the same conduct. *See generally* Jeffries, A Comment on the Constitutionality of Punitive Damages, 72 Va.L.Rev. 129 (1986).

The case is remanded with instructions that the jury's verdict be set aside and judgment entered in favor of Shamblin in the amount of $60,000.

*VACATED AND REMANDED.*

---

4. One commentator has observed that imposing "punitive damages vicariously on another is incongruous with the objective of deterrence. Punishing the employer or corporation for the acts of the servant simply metes out punishment based not on opprobrious conduct but on the mere legal relationship between the offending individual and the employer." Sales & Cole, *supra* note 3, at 1139; *see also* J. Ghiardi & J. Kircher, *Punitive Damages* § 2.04, at 11 (1984).