DEFENDER INDUSTRIES, INCORPO-
RATED, Plaintiff–Appellant,

and

Kathyrn G. Inabinet, Plaintiff,

v.

NORTHWESTERN MUTUAL LIFE
INSURANCE COMPANY,
Defendant–Appellee.

DEFENDER INDUSTRIES, INCORPO-
RATED, Plaintiff–Appellee,

and

Kathryn G. Inabinet, Plaintiff,

v.

NORTHWESTERN MUTUAL LIFE
INSURANCE COMPANY,
Defendant–Appellant.

Nos. 90–2006, 90–2007.

United States Court of Appeals,
Fourth Circuit.

Argued June 4, 1991.
Decided July 9, 1991.

Thomas English McCutchen, III, Thomas English McCutchen, Jr., Whaley, McCutchen, Blanton & Rhodes, Columbia, S.C., argued (John C. Bradley, Jr., Whaley, McCutchen, Blanton & Rhodes, Columbia, S.C., on brief), for plaintiff-appellant.

David Wallace Robinson, II, Robinson, McFadden & Moore, P.C., Columbia, S.C., argued (D. Reece Williams, III, D. Clay Robinson, Robinson, McFadden & Moore, P.C., Columbia, S.C., on brief), for defendant-appellee.

Before ERVIN, Chief Judge, and WIDENER, HALL, PHILLIPS, MURNAGHAN, SPROUSE and WILKINS, Circuit Judges.

## OPINION

WILKINS, Circuit Judge:

A jury returned a verdict in favor of Defender Industries, Incorporated, awarding it actual and punitive damages in a fraud action against Northwestern Mutual Life Insurance Company. Finding that the jury properly awarded punitive damages but was excessive in the amount of its award, the district court granted a motion by Northwestern for judgment notwithstanding the verdict as to the amount of the punitive damages and reduced the amount from $5,000,000 to $10,000. *Defender Indus., Inc. v. Northwestern Mut. Life Ins. Co.*, 727 F.Supp. 252, 260 (D.S.C. 1989). Alternatively, the district court ruled that in the event it committed error in granting the judgment n.o.v. it granted a new trial as to the amount of punitive damages. *Id.* After oral argument before a panel, rehearing was ordered before this court sitting en banc. Because we find the district court did err, we remand for proceedings consistent with this opinion.

### I.

In late 1985 Defender began investigating the life insurance market with a view toward replacing a five million dollar life insurance policy then in place on the life of the chairperson of its board of directors and principal shareholder, Kathryn G. Inabinet, with a policy of a greater amount. In response to a general inquiry, agents from Northwestern began to solicit the Defender account and ultimately the parties entered into negotiations over the terms of a policy.

Defender desired to obtain a life insurance policy to offset anticipated estate tax

liability that would become due at Inabinet's death. Defender retained professional assistance to value its stock in order to make an informed decision about the estimated amount of estate tax liability. Although Defender had not yet received the stock valuation when negotiations with Northwestern began, and therefore was not yet confident of the amount of insurance coverage it would require, Defender estimated that it needed between five and eight million dollars of coverage.

Defender wanted to have a new policy in place prior to the effective date of a new federal tax law affording less favorable tax treatment to insurance contracts entered into subsequent to the effective date. Northwestern agents were also anxious to close the deal because the sale of the policy would produce large commissions for them. As an inducement to Defender to purchase a policy from Northwestern, its agents represented that if Defender purchased the maximum amount of insurance coverage it anticipated it might need, Northwestern would permit Defender to reduce the coverage amount if, following receipt of the stock valuation, Defender determined that its actual insurance requirements were less. Northwestern agents explained that Northwestern would refund any excess premiums which resulted from such a reduction or would credit them toward future premiums. With this understanding, Defender purchased a policy for eight million dollars of coverage. Northwestern maintained possession of the policy and did not deliver it to Defender until after the dispute precipitating this lawsuit arose.

Some months after purchase of the policy, Defender determined that it actually required seven million dollars of coverage and sought to reduce the policy to this amount. Northwestern refused to reform the policy as promised. A Northwestern agent also threatened Defender with the loss of one of its largest customers over whom a Northwestern agent, through family connections, exercised some measure of influence in the event Defender should cancel the policy. Defender wrote to the chief executive officer (CEO) of Northwestern complaining of the misrepresentation and threat. Despite the fact that one of the Northwestern agents involved wrote to the CEO admitting that the conduct about which Defender complained had in fact occurred, the CEO wrote to Defender stating that an investigation had disclosed no reason to reduce the policy or discipline its agents. One reasonable interpretation of interoffice correspondence between high-ranking Northwestern officials would allow the conclusion that the upper echelons in the company were aware of the agents' misconduct and attempted to conceal it.

Defender permitted the policy to lapse and brought this action alleging breach of contract, breach of contract accompanied by a fraudulent act, fraud, constructive fraud, and negligence arising out of the misrepresentations and fraudulent statements made by the Northwestern agents in inducing Defender to purchase the policy. At the conclusion of all the evidence, the district court granted a motion by Northwestern for a directed verdict on the breach of contract, breach of contract accompanied by a fraudulent act, and negligence causes of action, reasoning that a South Carolina statute prohibited the type of agreement that Defender alleged the parties had entered. The district court denied a motion by Northwestern for a directed verdict on the fraud and constructive fraud allegations, ruling that the statute did not shield these two causes of action. Additionally, the district court denied a motion by Northwestern for a directed verdict on punitive damages.

The case was submitted to a jury which returned an actual damage award of $106,513.74, the exact amount Defender paid in premiums during the nine months the policy was in effect. The jury also returned a punitive damage award of $5,000,000 that was reduced to $10,000 by the district court.

## II.

### A.

In a diversity case, state substantive law governs the circumstances justifying an award and the amount of punitive

damages, and federal law governs district and appellate court review of the jury award. *Browning–Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 278–79, 109 S.Ct. 2909, 2922–23, 106 L.Ed.2d 219 (1989). In federal practice a "judgment n.o.v. should not be granted 'if there was any evidence in the case that would authorize a verdict for the plaintiff.'" *Warner v. Billups E. Petroleum Co.*, 406 F.2d 1058, 1059 (4th Cir.1969) (quoting *Tedder v. Merchants & Mfrs. Ins. Co. of N.Y.*, 251 F.2d 250, 254 (4th Cir. 1958)). This court reviews the grant of a judgment n.o.v. to determine if, viewing the evidence in the light most favorable to the party opposing the motion, a jury could reasonably find in favor of that party. *United States v. Tobias*, 899 F.2d 1375, 1378 (4th Cir.1990). The district court properly concluded that the imposition of punitive damages in some amount was justified under South Carolina law based upon evidence in the record that Northwestern agents acted recklessly, willfully, or wantonly, *see, e.g., Camp v. Components, Inc.*, 285 S.C. 443, 330 S.E.2d 315 (Ct.App.1985), in "intentionally misrepresent[ing] to Defender that there would be no 'loss of premium' should Defender decide to reduce coverage at a later date." 727 F.Supp. at 259.

### B.

■ Although deciding that the imposition of some amount of punitive damages was proper, the district court concluded that the jury award of $5,000,000 was "so grossly inflated as to constitute a miscarriage of justice." 727 F.Supp. at 260. Under traditional procedure, a district court, faced with what it believed to be an excessive damage award by a jury in a diversity case on a common-law cause of action, could set aside the excessive verdict by granting a new trial or a new trial *nisi* remittitur. *See Browning–Ferris*, 492 U.S. at 278–79, 109 S.Ct. at 2922–23; *see generally*, 11 C. Wright, A. Miller, & F. Elliott, *Federal Practice and Procedure* § 2815 (1973 & Supp.1991) (hereinafter Wright & Miller). The district court did not follow this established procedure by ordering a new trial *nisi* remittitur to the amount of $10,000. Instead, the court exercised authority granted by this court in *Shamblin's Ready Mix, Inc. v. Eaton Corp.*, 873 F.2d 736, 743 (4th Cir.1989) and ordered that judgment be entered in the amount of $10,-000.

*Shamblin's* involved a relatively insignificant tortious conversion but ultimately presented this court with an exceptional set of circumstances. In the first trial of *Shamblin's* a jury awarded punitive damages in the amount of $600,000. This court remanded for a new trial because the punitive damage award was tainted by plaintiff's improper and highly prejudicial closing argument. During the second trial, plaintiff committed similar errors, and the jury awarded $650,000 in punitive damages. Rather than remand for yet a third trial to assess the amount of punitive damages, the panel held that the seventh amendment does not entitle a plaintiff to a jury determination of the amount of punitive damages and ordered judgment entered in the amount of $60,000 for punitive damages.

■ A court has the inherent power to put an end to civil litigation in the interests of fairness and judicial economy when, by its conduct, one of the parties has, in effect, waived its right to a jury determination. This court, however, went much further in *Shamblin's*. Our holding meant that a jury determination of the amount of punitive damages in a diversity case on a state common-law cause of action is only advisory. Indeed, under *Shamblin's* a district court, having submitted the question of *liability* for punitive damages to the jury, could elect to withhold the determination of an appropriate amount from the jury altogether. In the event the jury returned a verdict in favor of the plaintiff on the issue of liability for punitive damages, the district court could enter judgment for an amount the court considered appropriate.

The court in *Shamblin's* based its seventh amendment decision in large measure on *Tull v. United States*, 481 U.S. 412, 107

S.Ct. 1831, 95 L.Ed.2d 365 (1987). The *Tull* Court addressed whether the seventh amendment guaranteed jury determinations of liability under a federal statute, the Clean Water Act, and of the amount of civil penalties that would be imposed under the Act. The Court found that liability under the Clean Water Act must be determined by a jury but that Congress' *delegation* of the assessment of the amount of the civil penalties to the district court did not offend the seventh amendment. The Court reasoned that "[s]ince Congress itself may fix the civil penalties, it may delegate that determination to trial judges." 481 U.S. at 427, 107 S.Ct. at 1840.

The panel in *Shamblin's* read *Tull* as holding "that because determination of a remedy in a civil trial is not an essential function of a jury trial the seventh amendment did not require a jury trial for the determination of the civil penalty." 873 F.2d at 741. The panel reasoned that punitive damages are similar to civil penalties and, therefore, a determination of the appropriate amount is not a fundamental element of a jury trial. While *Tull* does contain some rather broad language, the Court was deciding only the issue of whether the determination of the amount of a civil penalty imposed for violation of a federal statute could be delegated to the trial judge without the necessity of a jury determination. The *Tull* decision cannot stand for the proposition that a plaintiff bringing a state common-law cause of action does not have a right to a jury determination of the amount of punitive damages. *See Tull*, 481 U.S. at 428, 107 S.Ct. at 1841 (Scalia, J., concurring in part and dissenting in part) ("Even punitive damages are assessed by the jury...."). Rather, the *Tull* Court reasoned that the seventh amendment does not require that a jury determine the remedy in a civil trial unless such a determination is "necessary to preserve the 'substance of the common-law right of trial by jury.'" 481 U.S. at 426, 107 S.Ct. at 1840 (quoting *Colgrove v. Battin*, 413 U.S. 149, 157, 93 S.Ct. 2448, 2453, 37 L.Ed.2d 522 (1973)).

Over one hundred years ago the Supreme Court held that the seventh amendment guarantees a jury determination of the amount of tort damages. *Kennon v. Gilmer*, 131 U.S. 22, 9 S.Ct. 696, 33 L.Ed. 110 (1889). Moreover, the Supreme Court decisions in *Browning–Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989), and *Pacific Mutual Life Insurance Company v. Haslip*, —— U.S. ——, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), decided after *Shamblin's*, emphasize the fundamental character of a jury assessment of the amount of punitive damages. Although the *Browning–Ferris* decision principally addressed the application of the eighth amendment to punitive damages, petitioners had also argued that the amount of punitive damages awarded by the jury was excessive as a matter of federal common law. In discussing proper appellate review of the excessiveness of a punitive damage jury award, the Court stated:

> It is not our role to review directly the award for excessiveness, or to substitute our judgment for that of the jury. Rather, our only inquiry is whether the Court of Appeals erred in finding that the District Court did not abuse its discretion in refusing to grant petitioners' motion, under Federal Rule of Civil Procedure 59, for a new trial or remittitur....
>
> ... In a diversity action, or in any other lawsuit where state law provides the basis of decision, the propriety of an award of punitive damages for the conduct in question, and the factors the jury may consider in determining their amount, are questions of state law....
>
> In reviewing an award of punitive damages, the role of the District Court is to determine whether the jury's verdict is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered. The Court of Appeals should then review the District Court's determination under an abuse-of-discretion standard.

492 U.S. at 278–79, 109 S.Ct. at 2922–23. Additionally, the Court recognized that it has never explicitly ruled upon whether an

appellate court may, consistent with the seventh amendment, review a refusal by a district court to set aside a jury award as excessive. *See id.* at 279 n. 25, 109 S.Ct. at 2922 n. 25; *see also* Wright & Miller § 2820.

In *Haslip,* the Court reiterated the fundamental and historical role of the jury in the assessment of punitive damages. 111 S.Ct. at 1041–43. The Court noted:

> Under the traditional common-law approach, the amount of the punitive award is initially determined by a jury instructed to consider the gravity of the wrong and the need to deter similar wrongful conduct. The jury's determination is then reviewed by trial and appellate courts to ensure that it is reasonable.

*Id.* at 1042.

Several other circuits have, upon finding a punitive damage jury award excessive, ordered it reduced to a sum certain, *see Shamblin's,* 873 F.2d at 740–41; however, these decisions did not address the constitutional right to a jury trial. Indeed, in these cases the appellate court reduced the verdicts without any explanation or discussion of their authority to do so. On the other hand, the two Courts of Appeals that have considered whether a district court may reduce the amount of punitive damages awarded by a jury and enter judgment in that amount without providing a plaintiff an opportunity to accept a remittitur or receive a new trial have concluded that the right to a jury determination of the amount of punitive damages is guaranteed by the seventh amendment. *See O'Gilvie v. International Playtex, Inc.,* 821 F.2d 1438, 1447–48 (10th Cir.1987), *cert. denied,* 486 U.S. 1032, 108 S.Ct. 2014, 100 L.Ed.2d 601 (1988); *McKinnon v. City of Berwyn,* 750 F.2d 1383, 1391–92 (7th Cir.1984).

An assessment by a jury of the amount of punitive damages is an inherent and fundamental element of the common-law right to trial by jury. Therefore, we hold that the seventh amendment guarantees

the right to a jury determination of the amount of punitive damages, and overrule *Shamblin's Ready Mix, Inc. v. Eaton Corp.,* 873 F.2d 736 (4th Cir.1989). Because the district court acted under the authority of *Shamblin's,* we reverse the grant of judgment n.o.v. on the amount of punitive damages.

### III.

■ The district court conditionally granted a motion by Northwestern for a new trial on the issue of the amount of punitive damages in the event the grant of judgment n.o.v. was vacated or reversed.[1] *See* Fed.R.Civ.P. 50(c). In ruling on a motion for a new trial

> "[i]n federal practice, it is the duty of the district judge to set aside an excessive verdict even when such a verdict is supported by substantial evidence 'if he is of the opinion that the verdict is against the clear weight of the evidence, or is based upon evidence which is false, or will result in a miscarriage of justice'."

*Johnson v. Parrish,* 827 F.2d 988, 991 (4th Cir.1987) (quoting *Aetna Casualty & Sur. Co. v. Yeatts,* 122 F.2d 350, 352 (4th Cir. 1941)). We review the decision of the district court to grant a new trial merely for an abuse of discretion. *Browning–Ferris,* 492 U.S. at 279, 109 S.Ct. at 2922.

■ As noted above, the district court found the punitive damages verdict was so excessive as to constitute a miscarriage of justice. We cannot say that the grant of a new trial on the issue of the amount of punitive damages constituted an abuse of discretion. Whether we agree with the ruling of the district court is not at issue here, for we are constrained by the proper exercise of appellate review to affirm its decision.

### IV.

■ At the close of all the evidence, Northwestern moved for a directed verdict on all causes of action contending that a

---

1. On remand the district court may wish to consider the appropriateness of granting a new trial *nisi* remittitur.

South Carolina statute barred suit by Defender because it rendered illegal and unenforceable the promise upon which Defender based its suit. S.C.Code Ann. § 38–55–50 (Law.Co-op.1989 & Supp.1990). Defender argued that Northwestern had waived any defense of illegality to which it might otherwise have been entitled because it had failed to plead this affirmative defense. The district court then granted Northwestern's motion to amend its answer to assert illegality as a defense. Defender appeals this ruling.

■ A district court is to freely grant leave to amend " 'when justice so requires' " absent a compelling reason not to permit the amendment. *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962) (quoting Fed.R.Civ.P. 15(a)). Mere delay, when unaccompanied by actual prejudice, bad faith, or futility, does not justify a denial of leave to amend. *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509–10 (4th Cir.1986).

Although the motion to amend by Northwestern was made after the close of the evidence, Defender was unable to show any prejudice, for the record discloses that Defender was aware prior to trial that Northwestern intended to raise this defense. Additionally, Defender does not contend that it would or could have offered additional evidence to oppose this defense had the motion been made earlier. We find no abuse of the discretion vested in the district court.

## V.

■ Section 38–55–50 of the Code of Laws of South Carolina prohibits discrimination by an insurance company among insureds by *inter alia* prohibiting insurance agents from making a policy of insurance "other than as plainly expressed in the policy issued" and from paying "as inducement to the taking of insurance any rebate of premium payable on the policy." S.C.Code Ann. § 38–55–50. The district court found that this section foreclosed

causes of action sounding in breach of contract and breach of contract accompanied by a fraudulent act.[2] Since, as the district court interpreted it, the promise alleged by Defender was one for Northwestern to rebate policy premiums, the promise was unenforceable as against public policy because it violated the statute.

The district court concluded, however, that the statute did not preclude recovery on the fraud cause of action. Northwestern argues that the district court erred in concluding that the "anti-rebate" statute does not negate a right by Defender to rely on the promise—one of the elements Defender must prove in order to establish its fraud claim. *See First State Sav. & Loan v. Phelps*, 299 S.C. 441, 385 S.E.2d 821 (1989). We find persuasive the reasoning of the district court, 727 F.Supp. at 255–58, and affirm.

## VI.

■ Northwestern argues that the jury's award of the entire amount of the premiums paid by Defender for the Northwestern policy as actual damages was error. We find, as did the district court, that the jury could have properly concluded, based upon the evidence in the record, that but for the fraudulent representation by Northwestern concerning the policy, Defender would not have purchased the policy, and consequently it was injured in the amount of the premiums it paid. *Daniels v. Coleman*, 253 S.C. 218, 169 S.E.2d 593 (1969) (party injured by fraud entitled to receive as damages an amount that will put him in same position as if he had not been defrauded).

## VII.

For the foregoing reasons, we reverse the grant of judgment n.o.v. as to the amount of punitive damages and affirm the order of the district court in all other re-

---

**2.** Defender appeals this ruling. We need not reach the issue for Defender was awarded all of

its alleged actual damages on its fraud cause of action.

spects.[3] Accordingly, we remand for proceedings consistent with this opinion.

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.

---

3. Northwestern belatedly attempted to raise a due process challenge to the South Carolina punitive damages scheme during the supplemental briefing following argument of the case before a panel of this court. We decline to address this issue, as Northwestern has failed to pursue it in a timely manner.